## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 05 2019, 5:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Daniel J. Vanderpool
Vanderpool Law Firm, PC
Warsaw, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James A. Camp,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 5, 2019

Court of Appeals Case No.
19A-CR-25

Appeal from the
Wabash Circuit Court

The Honorable
Robert R. McCallen III, Judge

Trial Court Cause No.
85C01-1705-F1-585

**Kirsch, Judge.**

[1] James A. Camp ("Camp") was convicted of child molesting as a Level 1 felony,[1] child molesting as a Level 4 felony,[2] and attempted child molesting as a Level 1 felony.[3] He raises two issues, which we restate as:

> I. Whether sufficient evidence was presented to support his conviction for child molesting as a Level 1 felony because, he contends, there was no evidence that he actually touched the sex organ of the victim; and

> II. Whether his aggregate sentence of forty years is inappropriate.

[2] We affirm in part and reverse in part.

## Facts and Procedural History

[3] E.S., E.K., J.K., and A.M. (collectively, "the children") were friends who attended Shady Creek Elementary School near the small town of Lagro, Indiana. *Tr. Vol. 2* at 40-42, 125, 127-28, 179. A.M. was nine years old as was J.K., who is the younger brother of E.K, age eleven. *Id.* at 39-40, 48, 129, 179, 230-32. E.S. was nine years old. *Id.* at 151. Camp, age fifty-three, and his wife Debra, age fifty-six, also lived in Lagro and regularly let the children visit their home where the children would eat, watch movies, and play with Camp's drum

---

[1] *See* Ind. Code § 35-42-4-3(a)(1).

[2] *See* Ind. Code § 35-42-4-3(b).

[3] *See* Ind. Code § 35-41-5-1(a); Ind. Code § 35-42-4-3(a)(1).

set and action figures. *Id.* at 46-50, 131-34, 138. E.S., E.K., and J.K. occasionally spent the night at Camp's home. *Id.* at 144, 190.

[4] Camp is mentally impaired and suffers from several illnesses. He suffered two traumatic brain injuries as a child, one as an infant and the other as a high school freshman; the second injury put Camp into a coma for two weeks. *Tr. Vol. 3* at 129-30. He did not complete high school or obtain a G.E.D. *Id.* at 119. Camp's I.Q. of 79 places him in the bottom five percent of the population. *Tr. Vol. 4* at 47-48. Camp's cognitive problems include a poor short-term memory. *Id.* at 43. Camp suffers from depression, anxiety, schizophrenia, and diabetes. *Tr. Vol. 3* at 176; *Tr. Vol. 4* at 195-96. Camp's only prior conviction was for driving while suspended, a Class A misdemeanor. *Tr. Vol. 4* at 196. Camp does not work and receives a monthly disability check. *Tr. Vol. 3* at 186-88.

[5] On May 15, 2017, the children gathered to play at E.S.'s home. *Tr. Vol. 2* at 57-58. J.K. left the home for a few minutes, and A.M., E.S., and E.K. (collectively, "the girls") walked to the grounds of the nearby church for a water fight. *Id.* at 57-59. Once the girls were soaked, they stopped the water fight, and J.K. rejoined them a few minutes later. *Id.* at 60-61. The children walked to Camp's home, which was only one-half block away, and Camp let them come inside. *Id.* at 61-63. Camp was alone because Debra was at work. *Id.* at 63. Camp told the girls to change, gave them dry towels, and put their wet clothes in the dryer. *Id.* at 64-66. The girls changed in the bedroom, returned

to the living room wrapped in towels, and sat on the couch with Camp. *Id.* at 66-68. J.K. sat on the floor. *Id.* at 67.

[6] Camp let one of the girls put in a videotaped pornographic film, *Not the Wizard of Oz. Id.* at 67-68. During the movie, Camp reached under A.M.'s towel and rubbed her breasts and vagina. *Id.* at 69-73. A.M. was uncomfortable, so she moved away from Camp. *Id.* at 74. Camp pulled down his pants and showed the children his penis. *Id.* at 201. A.M. "triple-dog dared" Camp to do something to her that was depicted in the pornographic movie. *Id.* at 196-97; *Tr. Vol. 3* at 155-57. A.M., E.K., and E.S. went into the bedroom, and Camp followed them in. *Tr. Vol.* 2 at 77. J.K. stayed in the living room. *Id.*

[7] While in the bedroom, Camp again rubbed A.M.'s vagina. *Id.* at 77-78. E.S. "double-dog-dared" Camp to lick A.M.'s vagina. *Id.* at 80-81. Camp then put his head between A.M.'s legs and licked the bare skin of her vagina. *Id.* at 79-80; *Tr. Vol. 3* at 208-09. Camp returned to the living room, and the dryer indicated that the girls' clothes were done. *Tr. Vol. 2* at 82. The girls put their clothes back on, and all the children left Camp's home. *Id.* at 82-83.

[8] The next day, E.S.'s mother and A.M.'s mother approached Camp's home to confront him. *Tr. Vol. 3* at 171, 216. E.S.'s mother was carrying a gun, and A.M.'s mother was carrying a baseball bat. *Id.* After observing the women approaching, Camp called the police, stating he needed to speak to someone because he had done something wrong. *Id.* Officer Ryan Chambers ("Officer Chambers") arrived at Camp's home, and, soon after, Camp voluntarily

accompanied Officer Chambers to the Sheriff's Department to speak with Detective Mike Davis ("Detective Davis"). *Id.* at 49-50, 74, 172. During the interview with Detective Davis, Camp stated that the kids "threw [him] under the bus." *Id.* at 223.

[9] On May 22, 2017, the State charged Camp with Count I, child molesting, a Level 1 felony; Count II, child molesting, a Level 4 felony, and Count III, performing sexual conduct in the presence of a minor, a Level 6 felony. *Appellant's App. Vol. II* at 22. The State later moved to dismiss Count III and moved to add a new Count III, attempted child molesting, a Level 1 felony. *Id.* at 58-62. The trial court granted the State's requests. *Id.* at 8-9, 65.

[10] The jury trial began on November 7, 2018, and the jury found Camp guilty of all counts. *Tr. Vol. 2* at 2; *Tr. Vol. 4* at 179. At the December 7, 2018 sentencing hearing, Camp expressed remorse:

> Q. If [the children] were here, what would you like to say to them? There are family members here.
>
> A. There's are - there are family members here and I would just like to say I'm sorry. It should have never happened. I know that. I've spent the last year and seven months in jail thinking about what happened. I am sorry. I can't take it back. I wish I could. But I am very sorry. I am sorry.
>
> Q. Okay. Are you, uh, are you sorry that you're going to prison?
>
> A. No. (Inaudible).

Q. What do you mean?

A. I - I - I deserve to go to prison. I mean I - I - I'm guilty. I'm - I'm - I need to go.

Q. Okay.

A. For what I did.

*Tr. Vol. 4* at 203-04.

[11] The trial court found two aggravating factors: (1) Camp lured A.M. into the bedroom by showing her a pornographic movie; and (2) Camp attempted to justify his actions at trial by a child's dare and by testifying that he was "thrown under the bus." *Appellant's App. Vol. II* at 20. The trial court found three mitigating factors: (1) Camp's diminished mental capacity; (2) his minimal criminal history; and (3) his poor health. *Id*. The trial court imposed concurrent sentences of forty years with three years suspended for Count I, child molesting as a Level 1 felony, and eight years for Count II, child molesting as a Level 4 felony. *Id.* at 21. It vacated Count III, attempted child molesting, due to double jeopardy concerns. *Id.* at 20. Camp now appeals. We will provide additional facts as necessary.

# Discussion and Decision

## I.    Sufficiency of Evidence

[12]    Camp argues that the State failed to present sufficient evidence to support his conviction for child molesting as a Level 1 felony because the State failed to show that Camp and A.M. engaged in "other sexual conduct," i.e., "an act involving:  (1) a sex organ of one (1) person and the mouth or anus of another person."  *See* Ind. Code § 35-42-4-3(a)(1); Ind. Code § 35-31.5-2-221.5.  More specifically, Camp maintains that the State's evidence established, at most, that he licked A.M.'s "vaginal area," not her actual vagina.  *Appellant's Br.* at 18-20.

[13]    When we review the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses.  *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005).  Rather, we will affirm a conviction if we find that any reasonable factfinder could find a defendant guilty beyond a reasonable doubt when considering all the facts and inferences that favor the conviction.  *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009).  The evidence need not exclude every reasonable hypothesis of innocence, but it must support a reasonable inference of guilt to support the verdict.  *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007).

[14]    Camp maintains that the State proved only that he licked A.M.'s "vaginal area."  *Appellant's Br.* at 18-20.  Camp correctly observes that during cross-examination, A.M. testified that Camp "licked on the side of her vagina" and "two centimeters" to the side of her vagina.  *Tr. Vol. 2* at 98, 103-04.  This

testimony does not prove, he contends, that he committed an act involving his mouth and A.M.'s sex organ. *See* I.C. § 35-31.5-2-221.5.

[15] Camp, however, ignores the evidence that supports his conviction, and, thus, he asks us to reweigh the evidence, which our standard of review does not allow. *See McHenry*, 820 N.E.2d at 126. The evidence supporting the conviction included A.M.'s testimony. The following exchange between the prosecutor and A.M. established sufficient evidence for Camp's Level 1 felony child molesting conviction:

> Q. [B]ut where, exactly, was he licking you at?
>
> A. Um, right here.
>
> Q. Okay. Was it directly on your vagina?
>
> A. Yes.

*Tr. Vol. 2* at 79-80. Moreover, Camp's own testimony showed that he committed Level 1 felony child molesting. He stated, "I put my mouth on [the] upper part of her vagina." *Tr. Vol. 3* at 209.

[16] Finally, even if the State only proved that Camp licked A.M.'s vaginal area, such evidence would support Camp's conviction. As we said in *Bear v. State,* "[I]t defies common sense that the legislature intended to criminalize the oral stimulation of the vagina without also criminalizing the oral stimulation of the vaginal area." 772 N.E.2d 413, 425 (Ind. Ct. App. 2002), *overruled on other*

*grounds by* 784 N.E.2d 459 (Ind. 2003), *trans. denied*. Accordingly, the State presented sufficient evidence that Camp engaged in an act involving his mouth and A.M.'s sex organ and thereby presented sufficient evidence to support Camp's conviction for child molesting as a Level 1 felony. *See* I.C. § 35-31.5-2-221.5; I.C. § 35-42-4-3(a)(1).

## II. Sentencing

[17] Camp argues that his aggregate sentence of forty years is inappropriate. He correctly notes that his forty-year sentence for Level 1 felony child molesting is ten years more than the advisory sentence for Level 1 felonies and that his eight-year sentence for Level 4 felony child molesting is two years more than the advisory sentence for a Level 4 felony. *See* Ind. Code § 35-50-2-4(c); Ind. Code § 35-50-2-5.5. Camp is also correct that his conviction for Level 1 felony child molesting makes him a credit restricted felon, meaning he will receive one day of credit for each six days that he serves on that conviction. *See* Ind. Code § 35-50-6-3.1(d); Ind. Code. § 35-50-6-4(c); Ind. Code § 35-31.5-2-72(1).

[18] Under Indiana Appellate Rule 7(B), we may revise a sentence if we find the sentence is inappropriate considering the nature of the offense and the character of the offender. *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (2007). The "nature of offense" compares the defendant's actions with the required showing to sustain a conviction under the charged offense, *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008), while the "character of the offender" permits a broader consideration of the defendant's

character. *Anderson v. State*, 989 N.E.2d 823, 827 (Ind. Ct. App. 2013), *trans. denied*. Whether a sentence is inappropriate turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and other factors that come to light in a given case. *Cardwell*, 895 N.E.2d at 1224.

[19] We defer to the trial court's decision, and our goal is to determine whether the appellant's sentence is inappropriate, not whether some other sentence would be more appropriate. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). We seek to leaven the outliers, not to achieve a perceived correct result. *Cardwell*, 895 N.E.2d at 1225. While we must consider both the nature of the offense and the character of the offender, a defendant need not necessarily prove both prongs for us to find a sentence inappropriate. *Connor v. State*, 58 N.E.3d 215, 218-19 (Ind. Ct. App. 2016).

[20] Camp first argues that his sentence is inappropriate because while the nature of his offense was both immoral and illegal, his behavior was not the "worst of the worst," partly because E.S. and A.M. goaded him into committing his crimes. *Appellant's Br.* at 18. In support, he cites the fact that A.M. "triple-dog dared" him to do something to her that was depicted in the pornographic movie and that E.S. "double-dog-dared" Camp to lick A.M.'s vagina. *Id*. at 80-81, 196-97; *Tr. Vol. 3* at 155-57. He also tries to minimize the nature of his offense by claiming that neither act of molestation involved penetration and that his contact with A.M.'s body was momentary.

[21]   We are unpersuaded that the nature of Camp's offense justifies a sentence reduction. However, as we explain below, we find that Camp's aggregate sentence of forty years is inappropriate in light of his character.

[22]   First, we are convinced that Camp's intellectual limitations, poor judgment, and mental illnesses reduces Camp's culpability for his crimes. *See Cardwell*, 895 N.E.2d at 1224. Camp is intellectually impaired and suffers from several mental illnesses. He suffered two traumatic brain injuries as a child, one as an infant and the other as a high school freshman; the second injury put Camp into a coma for two weeks. *Tr. Vol. 3* at 129-30. Camp was not able to complete high school, even though he took remedial courses, and did not obtain a G.E.D. *Id.* at 119. His I.Q. of 79 places him in the bottom five percent of the population. *Tr. Vol. 4* at 47-48. Camp has been diagnosed with cognitive disorder NOS, which impairs thinking, cognitive ability, executive function, and judgment. *Id.* at 48, 50-51. According to Dr. Andrew Yoder ("Dr. Yoder"), a psychologist who examined Camp to determine if he was competent to stand trial, Camp manifested his poor judgment during the evaluation. *Id.* at 37, 48. As Camp recounted the incident with A.M., Camp tried to show his penis to Dr. Yoder to explain that his penis did not work "properly." *Id.* at 48. Camp's impaired judgment was also apparent when he testified that one of the reasons he molested A.M. was because both A.M. and E.S. "double-dog dared" and "triple-dog dared" Camp to engage in sexual conduct with A.M. *Tr. Vol. 2* at 79-81, 196-97; *Tr. Vol. 3* at 155-57; 208-09. When Camp's attorney asked Camp about the significance of being "triple-dog dared," Camp responded, "If

you don't do it, you're a worthless piece of shit." *Tr. Vol. 3* at 153. Besides these cognitive limitations, Camp suffers from mental illness, including depression, anxiety, and schizophrenia. *Tr. Vol. 3* at 176; *Tr. Vol. 4* at 195-96. These cognitive disabilities and mental illnesses lessen Camp's culpability for his crimes. *Cf. Young v. State*, 696 N.E.2d 386, 391 (Ind. 1998) (sentence manifestly unreasonable where trial court failed to consider defendant's mental disabilities).

[23]    Second, we find that Camp's expression of remorse reflects well on his character. At the sentencing hearing, Camp testified: "It should have never happened. I know that. I've spent the last year and seven months in jail thinking about what happened. I am sorry. I can't take it back." *Tr. Vol. 4* at 203-04. Camp even said he was not sorry that he would be incarcerated because he deserved to be punished: "I - I - I deserve to go to prison. I mean I - I - I'm guilty. I'm - I'm - I need to go. . . [f]or what I did." *Id.* at 204. *See McFall v. State*, 71 N.E.3d 383, 390 (Ind. Ct. App. 2017) (defendant's expression of remorse reflected positively on her character). Third, Camp's insignificant prior criminal record, one misdemeanor conviction for driving while suspended, provides another basis to find that his sentence is inappropriate. *Tr. Vol. 4* at 196; *See Sanchez v. State*, 938 N.E,2d 720, 722 (Ind. 2010) (lack of extensive criminal record supported finding that sentence was inappropriate).

[24]    Therefore, we find that in light of Camp's character, his aggregate sentence of forty years is inappropriate, and we thus invoke our authority under Indiana Appellate Rule 7(B) to reduce his sentence for child molesting as a Level 1

felony from forty years to thirty years. *See Conner*, 58 N.E.3d at 218-19 (a defendant need not necessarily prove both prongs for us to find a sentence inappropriate). We leave undisturbed the trial court's decision to suspend three years of Camp's sentence for Level 1 felony child molesting and its decision to run the sentences for both of Camp's convictions concurrently.

[25] Affirmed in part and reversed in part.

Vaidik, C.J., concurs.

Altice, J., concurs in part and dissents in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James A. Camp, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff* | Court of Appeals Case No. 19A-CR-25 |

**Alice, Judge, concurring in part and dissenting in part.**

[26]     I fully concur with the majority's sufficiency determination. But, with respect to sentencing, I cannot agree that Camp's forty-year sentence for Level 1 felony child molesting is an outlier or that a reduced advisory sentence is appropriate.

[27]     The nature of the crime is particularly aggravating. Camp welcomed four children – three nine-year olds and an eleven-year old – into his home. All but A.M. were regular visitors. He assisted the three girls in getting out of their wet clothes and gave them either large shirts or towels to cover up with while their clothes were drying. Shortly thereafter, he gathered with the children and played a pornographic movie with a child-like theme. Camp had recently added this to his collection of pornographic movies, and he had shown it to E.S. and/or E.K. in the preceding two weeks.

[28] While watching the movie on this occasion, Camp reached under A.M.'s towel/shirt multiple times and touched her bare skin, including her breast and vagina. This made nine-year-old A.M. uncomfortable. Camp also fast-forwarded through parts of the movie and stopped on a scene where "Dorothy was giving the Oz a blowjob." *Transcript Vol. 3* at 154. Around this point, Camp pulled his penis out of his pajama pants so that A.M., who was sitting near him, could see it. Camp then stopped on a scene were "OZ [was] having oral sex with Glenda." *Id*. at 155.

[29] A.M. moved away from Camp and eventually went into the bedroom. Camp followed shortly thereafter. There may have been some double- or even triple-dog daring, but that is beside the point. Fifty-three-year-old Camp went into the bedroom, rubbed A.M.'s vagina, and then began licking her vagina. E.S. testified that she watched for four or five minutes as Camp was "[l]icking [A.M.'s] coochy." *Transcript Vol. 2* at 149. E.S. was "freaking out in [her] mind" watching this. *Id*. at 150. When the dryer signaled that the clothes were dry, the children changed and left Camp's home.

[30] When A.M.'s mother picked her up from E.S.'s home that night, A.M. immediately told her mother that Camp had touched her inappropriately. As a result of this abuse, A.M. suffered terrifying nightmares and began wetting the bed, which she had not done for years. As found by the majority, nothing about the nature of Camp's offenses justifies a sentence reduction.

[31] Turning to Camp's character, I am of the impression that, while he certainly has mental health issues, those have been greatly exaggerated. First, he does not suffer from schizophrenia. The record establishes only that he has depression, anxiety, and cognitive disorder NOS.[4] His cognitive disability primarily manifests as issues with short-term memory.

[32] Although Camp does not work and is on disability, this is due to complications from his diabetes, not his mental health. In fact, Camp has a prior history of employment, working in a dangerous foundry position for about thirteen years before the facility closed. Additionally, despite his brain injury during his freshman year, Camp came close to graduating from high school – only three credits short because he had a disagreement with the "woods teacher". *Transcript Vol. 3* at 183. In other words, Camp was *able* to complete high school, he just decided not to.

[33] The majority notes that Camp has an IQ of 79, which places him in the bottom five percent of the population. A review of the competency evaluation completed by Dr. Yoder for trial, however, reveals that Camp's actual IQ may be higher than reported. Dr. Yoder notes in his summary: "The defendant's Full Scale WASI-II IQ score was at the high end of the Borderline range and he seemed to give intermittent effort on the tasks which may indicate that his scores were a low estimate of his current cognitive abilities." *Appellant's*

---

[4] Dr. Yoder testified that cognitive disorder NOS "could be a range of things" associated with some form of impairment associated with thinking and cognitive ability. *Transcript Vol. 4* at 50.

*Appendix Vol. III* at 8-9. Dr. Yoder made similar observations with regard to other test results:

> Data from the MMPI-2-RF were uninterpretable due to the defendant's response style that was highly suggestive of over-reporting and unusual even for those who have severe and genuine psychopathology.
>
> ****
>
> There were some indications from testing performance that Mr. Camp may have attempted to present as being less capable and in greater distress than what may be accurate upon more objective review. Mr. Camp endorsed items related to neurological functioning on the ECST-R to trigger the "feigning competency-related impairment." … Mr. Camp's performance on the RBANS Digit Span subtest raises concerns about his effort based on research that supports possible malingering for performances such as his.

*Id*. at 8.

[34] The trial court considered Camp's diminished mental capacity (and his minimal criminal history) as a mitigating circumstance in arriving at the sentence imposed. I am not convinced that Camp was deserving of more mitigation for this factor than that given by the trial court.

[35] Finally, while Camp expressed remorse, he repeatedly attempted to shift blame to the children and mitigate his culpability before and during the jury trial. He complained to the investigating officer that the children were throwing him under the bus, and Camp indicated at trial that each of his poor decisions was

the result of being dared by one or more of the children. Camp claimed at trial that on the day in question he did not understand that what he did to A.M. was wrong and that he "had a lapse in judgment on that day, that one day, and only that one day." *Transcript Vol. 3* at 214. Camp continued, "On that particular day, it just didn't register [that what he was doing was against the law]." *Id*. at 239. On this record, Camp's remorse rings hollow.

[36] I would uphold the partially-aggravated, concurrent sentences imposed by the trial court as not inappropriate.