FILED

Feb 22 2017, 5:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Donald R. Shuler
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ashley N. McFall,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

February 22, 2017

Court of Appeals Case No.
20A03-1602-CR-267

Appeal from the Elkhart Superior
Court

The Honorable Teresa L. Cataldo,
Judge

Trial Court Cause No.
20D03-1310-FA-57

**Vaidik, Chief Judge.**

# Case Summary

Ashley N. McFall was convicted of Class A felony dealing in methamphetamine (manufacturing) based in part on videos that a man took of her using his personal cell phone and then showed to a detective. The man, however, did not testify at trial.

In order to authenticate videos under the "silent-witness theory," there must be evidence describing the process or system that produced the videos and showing that the video is an accurate representation of the events in question. *See* Ind. Evidence Rule 901(b)(9). Here, however, when the videos were admitted into evidence at trial during the detective's testimony, there was no showing that the videos had not been altered **before** they were shown to the detective. However, we find that any error in the admission of the videos under the silent-witness theory was rendered harmless by McFall's subsequent testimony.

McFall also contends that the evidence is insufficient to support her conviction and that her forty-year sentence is inappropriate. While we find that the evidence is sufficient to support her conviction, we revise her sentence to the advisory term of thirty years given that this is McFall's first felony conviction and the progress that she has made since her arrest to overcome her addiction and get her life in order.

# Facts and Procedural History

[4] In October 2013, McFall rented a room in David Rojics' "drug house" on Center Street in Elkhart. Tr. p. 353. The rent was $10 a day. McFall told an acquaintance, Renee Crowder, about her living arrangements. Crowder was looking for a place to live, so she and her two young children moved into the house as well. The house had two bedrooms upstairs; McFall lived in one and Crowder and her children lived in the other. There were also two bedrooms in the basement: Rojics lived in one, and Terry Hess lived in the other.

[5] On October 13, 2013, Elkhart Police Department Officer Jason Reed was dispatched to the house on a report of methamphetamine activity. Crowder answered the front door; her children were nearby. Crowder told Officer Reed that Rojics and Hess were in the basement. After Crowder summoned Rojics and Hess to the front door, Officer Reed told them that he was there to investigate methamphetamine activity and asked for permission to look around. Officer Reed's initial walk-through revealed the presence of methamphetamine precursors as well as syringes and burnt tinfoil. Because of the presence of these items, Officer Reed decided to perform a more intensive search of the house. Officer Reed presented Rojics, Crowder, and Hess with a "Search Waiver Form"; all three adults consented to a more thorough search of the house. *Id.* at 345.

[6] By this time, more officers had arrived on the scene. The officers started searching the detached garage, where they found indicators of an active meth

lab. Because of the dangers associated with methamphetamine fumes, the officers decided to clear everyone from the house.

[7] While Officer Reed was still clearing the house, McFall showed up. She told Officer Reed that she had been living in an upstairs bedroom for a couple of weeks and that she did not want them searching her room. The officers stopped searching and sought a search warrant for the house.

[8] After a search warrant was obtained, Indiana State Police Clandestine Lab Officer Gretchen Smith searched the house. In McFall's bedroom, Officer Smith found numerous items associated with the manufacture and ingestion of methamphetamine, such as two containers of Coleman fuel, Drano, a coffee grinder with a white-powder residue, cold packs, coffee filters, a funnel, baggies, sulfuric acid, Crystal Drain Opener, aluminum foil with burn residue, empty pseudoephedrine blister packs, a pair of pliers (which are used to strip lithium from batteries), syringes, and a pen (which is used to inhale methamphetamine). In a storage area between McFall's and Crowder's bedrooms, Officer Smith found a Faygo bottle that was being used in the methamphetamine-manufacturing process. *Id.* at 450-51. In the detached garage, Officer Smith found several items on or near a workbench: a reactionary vessel, more Coleman fuel, and coffee filters. *Id.* at 459; *see also* Ex. 23 (photo of workbench).

[9] The next day, October 14, a man named "Javier" came to the Elkhart Police Department and asked to speak to an officer from the drug unit. *See, e.g.*, Tr. p.

754 (defense counsel's closing argument identifying Javier by name). Detective Andrew Whitmyer, who was working on the case, talked to him. Javier, whom Detective Whitmyer did not know, showed Detective Whitmyer two videos, each a few seconds long, on his personal cell phone. One of the videos shows McFall, on the evening of October 12, sitting at the workbench in the detached garage on Center Street manipulating some tubing that is consistent with making methamphetamine. *See id.* at 565-66. The other video shows McFall sitting at the workbench messing with her hair. Detective Whitmyer asked for Javier's identification, went over his background, and discussed his relationship with McFall. Because Javier gave several pieces of information that Detective Whitmyer knew to be true and thought could be useful to the drug unit, Detective Whitmyer planned to use Javier as a Confidential Source ("CS") in other cases. Detective Whitmyer then took Javier's phone, plugged it into a computer at the police department, and copied the videos to a DVD. Detective Whitmyer also made two still photos from the videos. Javier then left the police department with his cell phone. Detective Whitmyer did not list Javier's name in any police reports in the case.

[10] Thereafter, McFall was arrested and charged with one count: Class A felony dealing in methamphetamine (manufacturing) within 1000 feet of a youth-program center. Ind. Code Ann. § 35-48-4-1.1 (West 2012); Appellant's App. Vol. II p. 19. Among other people, the State listed "CS," but not Javier, on its witness list for trial. Appellant's App. Vol. II p. 46 (Amended Witness List).

[11]     At the jury trial, Detective Whitmyer testified that the CS never ended up working for the Elkhart Police Department, which is common. Tr. p. 594. The CS did not testify at trial either. By this time, however, defense counsel had already figured out that the CS was Javier.[1] The State introduced the videos (Exhibit 27) and two still photos (Exhibits 28 & 29) through Detective Whitmyer. The videos and still photos have date and time stamps. They are all dated October 12; Exhibit 28 has a timestamp of 6:25 p.m. while Exhibit 29 has a timestamp of 6:42 p.m. McFall objected to the admission of the videos and photos; the trial court admitted them over her objection pursuant to Evidence Rule 901 and the silent-witness theory. *Id.* at 526-29. McFall then testified in her own defense. Specifically, McFall testified that on October 12, she and Javier, with whom she had an "unhealthy relationship," *id.* at 666, were in the detached garage at Center Street. She was sitting at the workbench and Javier was sitting behind her. She specifically identified herself in the photos and videos and identified items in the photos and videos. *See, e.g.*, *id.* at 663-65, 698-99. In addition, she acknowledged that methamphetamine was being manufactured at the time the videos were taken; however, she claimed that Javier was the "cook" and that she was simply a meth addict who lived in a drug house. Finally, she denied that many of the items found in her bedroom were hers.

---

[1] Neither the State nor defense counsel could locate Javier before trial. Tr. p. 521-22. They suspected that he had left the state.

[12] The jury found McFall guilty as charged. At the sentencing hearing, the trial court found the following aggravators: McFall has a criminal history (no felonies but misdemeanors for operating a motor vehicle without ever receiving a license (two), minor consumption of alcohol, and possession of marijuana); she has a history of abusing alcohol and drugs; children lived in the house on Center Street; she did not take advantage of addictions evaluation/treatment that was available to her through a previous conviction; and she has not taken responsibility for her own children. The court then identified the following mitigators: McFall "has done some things [while in jail] to better her situation"; she has family in place that is willing to help her; she exhibited remorse in the courtroom; and people provided statements in support of her. Appellant's App. Vol. II p. 132. Concluding that the aggravators outweighed the mitigators, the trial court sentenced McFall to forty years. The court ordered McFall to serve the "first ten (10) years . . . executed at the [DOC]." *Id.* at 133. After the first ten-year portion of the sentence, the court ordered McFall to serve "the next twenty (20) years as a participant in the Elkhart County [Community] Corrections Home Detention Program." *Id.* The court ordered "the final ten (10) years of her sentence suspended" to reporting probation. *Id.*

[13] McFall now appeals.

# Discussion and Decision

[14] McFall raises three issues on appeal. First, she contends that the trial court erred in admitting into evidence the cell-phone videos and still photos made

from the videos because they were not properly authenticated. Second, she contends that the evidence, even with the videos and photos, is insufficient to support her conviction. Last, she contends that her sentence is inappropriate.

# I. Admission of Cell-Phone Videos and Photos

[15] McFall first contends that the trial court erred in admitting into evidence the cell-phone videos and still photos made from the videos. She argues that they were not properly authenticated because Javier, the CS, did not testify at trial. The State responds that the videos and photos were properly authenticated under the silent-witness theory.

[16] Indiana Evidence Rule 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Photographs and videos can be authenticated through either a witness's testimony or, in instances in which no witness observed what a photograph or video portrays, the silent-witness theory. 13 Robert L. Miller, Jr., Indiana Practice, *Indiana Evidence* § 901.209 (4th ed. 2016). Here, because Javier did not testify at trial, the State sought to authenticate the videos and photos using the silent-witness theory. *See Mays v. State*, 907 N.E.2d 128 (Ind. Ct. App. 2009) (although the confidential informant ("CI") did not testify at trial, the digital audio/video recording of the controlled buy was admitted into evidence through the detective pursuant to the silent-witness theory), *trans. denied*.

[17] In order to authenticate videos or photographs using the silent-witness theory, there must be evidence describing the process or system that produced the videos or photographs and showing that the process or system produced an accurate result. *See* Ind. Evidence Rule 901(b)(9). The requirements are "rather strict." 13 Miller at § 901.209. That is, the proponent must show that the photograph or video was not altered in any significant respect, and the date the photograph or video was taken must be established when relevant. *Id.*; *see also Wise v. State*, 26 N.E.3d 137, 141 (Ind. Ct. App. 2015) (noting that when automatic cameras are involved, "there should be evidence as to how and when the camera was loaded, how frequently the camera was activated, when the photographs were taken, and the processing and changing of custody of the film after its removal from the camera." (quotation omitted)), *trans. denied*. If a foundational requirement is missing, then the surrounding circumstances can be used. 13 Miller at § 901.209 ("Rule 901(b)(9) requires only that the process or system be described in such a way as to allow the trier of fact to find that it is more likely than not that the system produced an accurate result.").

[18] Here, the State introduced videos that Javier allegedly took on his personal cell phone on October 12 through Detective Whitmyer. There was no showing, however, that the videos had not been altered in any significant respect **before** Javier showed up at the police station on October 14 and asked to speak to a member of the drug unit. This is unlike the typical CI case, where the CI records an event and the police then introduce the recording into evidence at trial because the CI does not testify. In those cases, the police use their own

recording equipment and remove the equipment from the CI when the event is over. *See Mays*, 907 N.E.2d at 132 (although the CI did not testify at trial, the recording of the controlled buy was admitted under the silent-witness theory; the detective testified that he personally prepared the audio/video recording equipment and then removed the equipment from the CI immediately after the controlled buy). Here, however, Detective Whitmyer exercised no control over the process used to record McFall and could not attest to the accuracy of the videos. Accordingly, the videos and photos were not properly authenticated when the trial court admitted them during Detective Whitmyer's testimony.

[19] However, we are not restricted solely to the circumstances presented to the trial court at the time of the ruling. *Dausch v. State*, 616 N.E.2d 13, 17 (Ind. 1993). A questionable foundation for the admissibility of evidence may be cured by later testimony. *Id.* On direct and cross exam, McFall identified herself in the videos and photos and acknowledged that the events depicted in them occurred on October 12. *See, e.g.*, Tr. p. 660, 663-65, 698-99. Accordingly, any error in the admission of the videos and photos under the silent-witness theory was rendered harmless by McFall's subsequent testimony. *See Dausch*, 616 N.E.2d at 17.

## II. Sufficiency of the Evidence

[20] McFall next contends that the evidence is insufficient to support her conviction for Class A felony dealing in methamphetamine. Sufficiency-of-the-evidence claims face a steep standard of review: we consider only the evidence and

reasonable inferences most favorable to the convictions, neither reweighing evidence nor assessing witness credibility. *Griffith v. State*, 59 N.E.3d 947, 958 (Ind. 2016). We affirm the judgment unless no reasonable factfinder could find the defendant guilty. *Id.*

[21] In order to convict McFall as charged here, the State had to prove that McFall knowingly manufactured[2] methamphetamine, pure or adulterated, within 1000 feet of a youth-program center. Appellant's App. Vol. II p. 19; Ind. Code Ann. § 35-48-4-1.1 (West 2012).[3] McFall concedes that "throughout the house on . . . Center Street, including [her] room . . . and the garage, there were various items and precursors that are used in the manufacture of methamphetamine, and that active pots were found in the upstairs closet and the garage." Appellant's Br. p. 26. However, McFall points out that many of these items were "also consistent with someone who was using methamphetamine, and [McFall] openly admitted she was addicted at the time." *Id.* Accordingly, she argues that the evidence is insufficient to prove beyond a reasonable doubt that she "was involved beyond merely using methamphetamine." *Id.*

[22] In McFall's bedroom, Officer Smith found numerous items associated with the manufacture and ingestion of methamphetamine, such as two containers of Coleman fuel, Drano, a coffee grinder with a white-powder residue, cold packs,

---

[2] *See* Ind. Code § 35-48-1-18 (defining "manufacture").

[3] McFall does not dispute that the house on Center Street was within 1000 feet of a youth-program center.

coffee filters, a funnel, baggies, sulfuric acid, Crystal Drain Opener, aluminum foil with burn residue, empty pseudoephedrine blister packs, a pair of pliers (which are used to strip lithium from batteries), syringes, and a pen (which is used to inhale methamphetamine). Officer Smith testified that except for the syringes, pen, and foil, the other items were specifically associated with manufacturing methamphetamine. Tr. p. 438-47. In addition, in a storage area between McFall's and Crowder's bedrooms, Officer Smith found a Faygo bottle that was being used in the methamphetamine-manufacturing process. This pop bottle, easily accessible to McFall and coupled with the items found in her bedroom, is a very strong indicator that **she** was manufacturing methamphetamine. Finally, McFall identified herself in the videos and still photos and admitted that methamphetamine was being manufactured at the time. Although McFall claimed that Javier was the cook and that she was just an addict, the jury was entitled to believe otherwise. We therefore find that the evidence is sufficient to support McFall's conviction for Class A felony dealing in methamphetamine.

## III. Inappropriate Sentence

Last, McFall contends that her forty-year sentence—with ten years executed in the DOC, twenty years of home detention, and ten years suspended to probation—is inappropriate. She asks us to reduce the executed portion of her sentence. *See* Appellant's Br. p. 33. The Indiana Constitution authorizes independent appellate review and revision of a trial court's sentencing decision. *Brown v. State,* 10 N.E.3d 1, 4 (Ind. 2014). We implement this authority

through Indiana Appellate Rule 7(B), which provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Id.* McFall bears the burden on appeal of establishing that her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[24] The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State,* 895 N.E.2d 1219, 1225 (Ind. 2008). Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case. *Id.* at 1224. In assessing whether a sentence is inappropriate, appellate courts may take into account whether a portion of the sentence is ordered suspended or is otherwise crafted using any of the variety of sentencing tools available to the trial judge. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010). These tools include probation, home detention, placement in a community-corrections program, and executed time in a DOC facility. *Id.*

[25] Here, McFall's offense was elevated to a Class A felony because it occurred within 1000 feet of a youth-program center.[4] At the time of the offense, the sentencing range for a Class A felony was between twenty and fifty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4. The trial court sentenced her to an above-advisory term of forty years.

[26] As for the nature of the offense, McFall manufactured methamphetamine in a drug house in which a housemate's children also lived.

[27] As for McFall's character, her limited criminal history reflects that she is not a professional drug dealer or manufacturer but rather an addict who moved into a drug house because it gave her easier access to methamphetamine. At age twenty-seven, this is her first felony conviction. As the trial court acknowledged, McFall, after having spent two-and-a-half years in jail, expressed remorse at sentencing. McFall was "grateful" for her sobriety and the knowledge that she had gained while in jail. Tr. p. 805. Also as the trial court acknowledged, several people testified and submitted letters on her behalf. For example, McFall's creative-writing teacher explained "how far [McFall] ha[d] come in her effort to rebuild her life" while in jail. Appellant's App. Vol. II p. 130. Her GED teacher also submitted a letter describing how much McFall had "impressed" her. *Id.* at 131. In addition, McFall had secured a job for home detention. *Id.* at 129. Finally, McFall's father submitted a letter in

---

[4] This is no longer an enhancing circumstance under the amended sentencing statutes. *See* Ind. Code Ann. § 35-48-1-16.5 (West Supp. 2016).

which he opined that McFall's arrest for this crime was the only thing that could have saved her from her addiction. *Id.* at 128. Indeed, the State recognizes on appeal that it is "commendable that [McFall] has made positive changes in her life since she has been incarcerated." Appellee's Br. p. 25.

[28] Given that this is McFall's first felony conviction and the progress that she has made since her arrest to overcome her addiction and get her life in order, we believe that an above-advisory sentence is inappropriate. We therefore revise McFall's sentence to the advisory term of thirty years, with fourteen years executed and sixteen years suspended (with two of those suspended years to be served on probation). Of the executed time, McFall must serve ten years in the DOC and four years on home detention. All portions of her sentence should include substance-abuse treatment as needed.

[29] Affirmed in part, reversed in part.

Bradford, J., and Brown, J., concur.