## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 19 2019, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Zachary J. Stock
Attorney at Law, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Dwight Teague,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

November 19, 2019

Court of Appeals Case No.
19A-CR-573

Appeal from the
Hendricks Superior Court

The Honorable
Mark A. Smith, Judge

Trial Court Cause No.
32D04-1608-F2-13

**Vaidik, Chief Judge.**

# Case Summary

[1] Dwight Teague was tried by a jury in absentia for drug charges stemming from two controlled buys. When the jury found Teague guilty, defense counsel stipulated that Teague was a habitual offender. The trial court sentenced Teague to twenty years enhanced by six years for being a habitual offender.

[2] Teague now appeals, arguing that the trial court erred in admitting drugs from one of the controlled buys and a video from the other controlled buy and that we should vacate his habitual-offender adjudication and remand this case for a new trial on the habitual-offender charge because he did not personally waive his right to a jury trial on that charge. We find no error in the admission of the drugs and video. However, we agree with Teague that he is entitled to a new trial on the habitual-offender charge.

# Facts and Procedural History

[3] In August 2016, a confidential informant (CI) working with the Hendricks County United Drug Task Force set up a drug deal with Teague. On August 17, Teague and the CI made plans to meet in the parking lot of the Plainfield Walmart. Task-force members met up with the CI at a briefing location, where the CI was searched, fitted with an audio-video recording device, and given $880 in buy money. John Maples, a detective with the task force, then drove the CI to Walmart in an unmarked police car. While they were waiting for Teague, Detective Maples activated the recording device. When a white car

arrived at Walmart, the CI got out of the unmarked police car and "flag[ged]" it down. Tr. p. 128. The CI then got into the backseat of the white car. The CI was inside the white car for about five minutes. Detective Maples had the CI in his view "the entire time." *Id.* After about five minutes, the CI got out of the white car and back into the unmarked police car. Once inside the car, Detective Maples took the drugs from the CI and then deactivated and removed the recording device from him. Detective Maples kept control of the recording device. *Id.* at 133. Subsequent testing revealed that the substance was 11.56 grams of fentanyl.

[4] On August 30, 2016, the CI set up a second drug deal with Teague. This time, they agreed to meet at a hotel "just off of 70 and 267" in Hendricks County. *Id.* at 119. This buy, however, did not occur, as the task force planned on "try[ing] to do a traffic stop and get [Teague] with the narcotics that way so [they] didn't have to" involve the CI. *Id.*; *see also id.* at 36 (explaining that the plan was to make a traffic stop "if" an infraction occurred). Task-force members took up positions near the hotel while Ben Pyatt, a captain with the Brownsburg Police Department who often assisted the task force, parked his black Chevrolet Tahoe in the median of I-70 and waited for Teague's car to approach from Indianapolis. Captain Pyatt was given a description of Teague as well as the possible cars he might be driving. After waiting about two hours, Captain Pyatt observed a car and a driver that fit the descriptions he was given. Captain Pyatt noted that this car, which was traveling around 60 to 70 miles per hour, was following the car in front of it "too closely," in other words, "you could maybe

squeeze one car between" the two cars. *Id.* at 165, 166; *see* Ind. Code § 9-21-8-14(b) ("A person who drives a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of both vehicles, the time interval between vehicles, and the condition of the highway."). Captain Pyatt pulled onto I-70 and followed the car for several miles. During this time, the car continued following the car in front of it too closely. As the car "exited onto 267," Captain Pyatt activated his lights and pulled it over. *Id.* at 167. Captain Pyatt didn't know that the driver of this car was Teague until he walked up to it. When Captain Pyatt asked Teague to come back to his Tahoe, he smelled marijuana. As the two of them sat in the Tahoe, Captain Pyatt could still smell marijuana. After Teague admitted that he had recently smoked marijuana, Captain Pyatt told him that he was going to search his car and asked him to step out of the Tahoe so that he could check him for weapons. Captain Pyatt exited the Tahoe and walked to the front passenger side to open the door. There, Captain Pyatt saw Teague leaning over the Tahoe's center console "messing with something." *Id.* at 169. As soon as Teague exited the Tahoe, Captain Pyatt "reached to where [Teague] had been messing" and found a bag that contained what he believed to be marijuana and heroin. *Id.* The contents of the bag were later examined and found to contain four smaller bags containing 3.52 grams of marijuana, 13.99 grams of heroin, 7.13 grams of heroin, and 0.35 grams of cocaine. Teague was arrested and taken to jail, where his photo was taken.

[5]     Thereafter, the State charged Teague with Count I: Level 2 felony dealing in a narcotic drug (heroin, August 30); Count II: Class B misdemeanor possession of marijuana (August 30); and Count III: Level 2 felony dealing in a narcotic drug (fentanyl, August 17). The State also alleged that Teague is a habitual offender. Teague was released on bond.

[6]     Before trial, Teague filed a motion to suppress the drugs found during the August 30 traffic stop, arguing that "there was no valid reason to stop [his] vehicle." Appellant's App. Vol. II p. 93. The trial court held a hearing on Teague's motion immediately before the jury trial was scheduled to begin on the morning of January 9, 2018. Teague was not present at the beginning of the hearing, and defense counsel told the court that Teague had just texted him that he was on his way. During the hearing, Captain Pyatt and a task-force member testified about the August 30 stop. The trial court denied Teague's motion to suppress. Tr. p. 45. When Teague still was not present at 9:05 a.m., the trial court issued a warrant for his arrest. The court then conducted the jury trial in his absence.

[7]     During trial, Detective Maples testified that he wasn't "close enough" to identify Teague at Walmart on August 17. *Id.* at 133. However, he was later able to identify Teague from the video taken from the CI's recording device on August 17 (Exhibit 3) and comparing that to the photo of Teague taken when he was arrested on August 30. Detective Maples acknowledged that the date-and-time stamp on the video was not correct but confirmed that the video was taken on August 17, 2016. In addition, he noted that the date on the CD and

the CD case both said August 17, 2016. *Id.* at 159-60. Detective Maples explained that they "don't ever adjust" the date-and-time stamp. *Id.* at 142; *see also id.* at 155 ("I never go into those internal data bases and mess with date and time because as far as with our investigation we know, we document how we need it documented. Those we've never put in – we've never put too much emphasis on – on that time stamp."). Teague objected to the admission of Exhibit 3 on the ground that the State did not properly authenticate the video pursuant to the silent-witness theory. The trial court overruled his objection and admitted the exhibit. *Id.* at 139.

[8] When the jury later informed the trial court that it had reached a verdict, the court noted that defense counsel had previously indicated that he would stipulate to the habitual-offender charge in the event the jury found Teague guilty on one of the felony counts. The court said that it wanted to make sure that there was "a clear record" that defense counsel was "stipulating on the habitual count in the event there's a guilty on either [Count I or III]." *Id.* at 218. Defense counsel confirmed that he would stipulate. *Id.* The trial court then brought in the jury, who found Teague guilty of Counts I-III. The court entered judgments of conviction on Counts I-III and, "[p]ursuant to counsel's stipulation," found that Teague was a "habitual felony offender." *Id.* at 219.

[9] About a year later, in December 2018, Teague was arrested on the warrant. At the March 2019 sentencing hearing, the trial court sentenced Teague to twenty years on Count I, enhanced by six years for being a habitual offender, and concurrent sentences of 180 days on Count II and twenty years on Count III.

Teague now appeals.

# Discussion and Decision

## I. Admission of Drugs from August 30 Stop

Teague first contends that the trial court erred in admitting the drugs from the August 30 traffic stop because the stop was "an unreasonable seizure that violated the protections of Article 1, Section 11 of the Indiana Constitution." Appellant's Br. p. 9.

It is "well settled that investigative stops, like traffic stops," are subject to the protections of Article 1, Section 11. *Marshall v. State*, 117 N.E.3d 1254, 1261-62 (Ind. 2019), *cert. denied*. Although police officers may stop a car when they observe minor traffic violations, "they must do so under Article 1, Section 11's strictures." *Id.* at 1262. When a defendant challenges the propriety of an investigative stop under the Indiana Constitution, the burden falls to the State to show that the police conduct "was reasonable under the totality of the circumstances." *Id.* (quotation omitted). We decide whether a stop was reasonable under the totality of the circumstances by applying the three-part *Litchfield* test, whereby we evaluate: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law-enforcement needs. *Id.*; *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005).

[13]　On appeal, Teague focuses on the first *Litchfield* factor.  That is, he argues that Captain Pyatt "had no objective basis for his belief that the driver he stopped . . . had committed a traffic violation."  Appellant's Br. pp. 7-8.  Teague acknowledges Captain Pyatt's testimony that he was driving 60 to 70 miles per hour on I-70 and that there was just one car length between his car and the car in front of it; however, he claims that Captain Pyatt had no explanation for these estimates.  We disagree.

[14]　Captain Pyatt stopped Teague's car pursuant to Indiana Code section 9-21-8-14(b), which provides that "[a] person who drives a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of both vehicles, the time interval between vehicles, and the condition of the highway."  Captain Pyatt, who had been a police officer for at least fifteen years and had spent many of those years patrolling I-65, I-70, and I-74, testified that Teague was driving around 60 to 70 miles per hour on I-70 and that he was following the car in front of it "too closely."  Tr. p. 165.  Captain Pyatt explained that Teague was following so close that "you could **maybe** squeeze one car between" Teague's car and the car in front of it.  *Id.* at 166 (emphasis added).  Captain Pyatt not only gauged this distance from his vantage point on the median, but he also followed Teague for several miles on I-70, observing that Teague maintained the same speed and short distance.  *Id.* (Captain Pyatt testifying that when he followed Teague on I-70, they were driving "between sixty and seventy mile an hour.").  Based on these facts,

Captain Pyatt had a strong degree of concern or suspicion that Teague was following too closely in violation of Section 9-21-8-14.

[15] As for the other two *Litchfield* factors, Teague concedes that the intrusion was "relatively minor." Appellant's Br. p. 10. However, he argues that there was "no immediate need for the stop given the sting operation in place." *Id.* But Teague doesn't develop this argument or cite any authority for the proposition that law enforcement must have further "need" for a traffic stop once they have observed a traffic violation. We therefore conclude that the August 30 traffic stop was reasonable under Article 1, Section 11.[1] The trial court did not err in admitting the drugs found during the stop.

## II. Admission of Video from August 17 Buy

[16] Teague next contends that the trial court erred in admitting Exhibit 3—the video from the August 17 buy—because it was not properly authenticated. Indiana Evidence Rule 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Photographs and videos can be authenticated through either a

---

[1] Teague argues that this case is "very much like" *Turner v. State*, 862 N.E.2d 695 (Ind. Ct. App. 2007). Appellant's Br. p. 11. We disagree. In *Turner*, a police officer pulled over the defendant for speeding. The officer, based on his training, estimated the defendant's speed at fifty-five miles per hour; however, the officer did not know the speed limit where he stopped the defendant. We found that the stop was not reasonable under Article 1, Section 11 and held that evidence stemming from the stop was inadmissible. The problem in *Turner* was that the police officer did not know the speed limit but pulled over the defendant for speeding. That problem is not present here.

witness's testimony or, in instances in which no witness observed what a photograph or video portrays, the silent-witness theory. *McFall v. State*, 71 N.E.3d 383, 388 (Ind. Ct. App. 2017); 13 Robert L. Miller, Jr., Indiana Practice, *Indiana Evidence* § 901.209 (4th ed. Aug. 2019 update). Here, because the CI did not testify at trial and none of the task-force members saw what happened inside the white car, the State had to authenticate Exhibit 3 using the silent-witness theory. *See Mays v. State*, 907 N.E.2d 128 (Ind. Ct. App. 2009) (although the confidential informant did not testify at trial, the audio/video recording of the controlled buy was admitted into evidence through the detective pursuant to the silent-witness theory), *trans. denied*.

[17] In order to authenticate videos or photographs using the silent-witness theory, there must be evidence describing the process or system that produced the videos or photographs and showing that the process or system produced an accurate result. Ind. Evidence Rule 901(b)(9); *see also McFall*, 71 N.E.3d at 388. The authenticating witness is not required to testify that the photograph or video is an accurate representation of the scene as it appeared in the photograph or video and, indeed, often could not do so since they were not necessarily there to observe the scene. *Knapp v. State*, 9 N.E.3d 1274, 1282 (Ind. 2014). Rather, "Rule 901(b)(9) requires only that the process or system be described in such a way as to allow the trier of fact to find that it is more likely than not that the system produced an accurate result." 13 Miller at § 901.209.

[18] Here, Detective Maples testified that the CI was fitted with an audio-video recording device and that he activated the device while they were waiting in the

Walmart parking lot. When the controlled buy was over and the CI got back into the unmarked police car, Detective Maples deactivated the recording device, removed it from the CI, and kept control of it. On appeal, Teague doesn't challenge these steps; rather, he claims, without citation to authority, that the silent-witness theory compels "either that the dates match or that a better explanation is put forward." Appellant's Br. p. 14. At trial, Detective Maples acknowledged that the date-and-time stamp on the video did not match the date of the controlled buy—August 17, 2016. However, he said that the controlled buy indeed occurred on August 17, 2016—as indicated by the date on the CD and the CD case. Detective Maples explained that he never "mess[es] with" the internal settings of the recording equipment and that they don't "put too much emphasis on . . . [the] time stamp" because they document the date and time in other ways. Tr. p. 155. Because these facts show that it was more likely than not that the system produced an accurate result, the trial court properly admitted Exhibit 3.

## III. Habitual-Offender Enhancement

[19] Last, Teague contends that the trial court was required to hold a jury trial on the habitual-offender charge because it did not get a personal waiver from him (and in fact could not have done so since he was not present) of his right to a jury trial on the habitual-offender charge.[2] In *Saylor v. State*, 55 N.E.3d 354

---

[2] The State does not object to Teague raising this issue on direct appeal.

(Ind. Ct. App. 2016), *reh'g denied*, *trans. denied*, this Court held that when a defendant pleads guilty to a habitual-offender charge, they must personally waive their right to a jury trial on that charge. The State petitioned for rehearing in *Saylor*, which we denied, and then sought transfer, which our Supreme Court denied. The State acknowledges *Saylor* but argues that it was wrongly decided. The State, however, has failed to persuade us that *Saylor* was wrongly decided. Accordingly, because Teague did not personally waive his right a jury trial on the habitual-offender charge, we vacate his habitual-offender adjudication and remand this case for a new trial on that charge.

[20] Affirmed in part and vacated and remanded in part.

Riley, J., and Bradford, J., concur.