## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 20 2020, 8:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Denise L. Turner
DTurner Legal LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James Henry Stewart, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff,*

November 20, 2020

Court of Appeals Case No.
19A-CR-2661

Appeal from the Madison Circuit Court

The Honorable Mark Dudley, Judge

Trial Court Cause No.
48C06-1705-MR-1227

**Robb, Judge.**

# Case Summary and Issues

[1]     Following a jury trial, James Stewart was convicted of murder and sentenced to serve fifty-seven years in the Indiana Department of Correction. Stewart appeals and presents two issues for our review: (1) whether the trial court abused its discretion in admitting certain evidence at trial; and (2) whether the trial court erred in denying Stewart's motion to recuse the lead deputy prosecutor. Concluding the trial court did not abuse its discretion in admitting the evidence or in denying Stewart's motion, we affirm.

# Facts and Procedural History

[2]     The facts most favorable to the verdict are as follows. In May 2017, Montez McCloud and Cheyanne Gosler had been dating for approximately five years. Gosler's best friend, Hailey Carr, had been in a long-term relationship with Stewart. Stewart and Carr lived in a house at 1717 Jefferson Street in Anderson with their children.[1] On May 9, after Gosler picked up McCloud's lost cellphone, she and McCloud got into a disagreement. Gosler drove to Carr and Stewart's house, parked in their driveway, and went inside. McCloud later drove a moped to the house. Gosler walked outside and she and McCloud then walked back into the house where Gosler got her keys and phone. Carr testified that McCloud began hitting Gosler, prompting Carr to yell for Stewart, who

---

[1] Stewart and Carr shared one son together but Stewart helped raise Carr's other children.

had been sleeping in a room in the back of the house. Carr told them to "get out." Transcript of Evidence, Volume IV at 126. McCloud and Gosler left the house and Carr and Stewart followed. The four began arguing.

[3] David Lennen lived across the street and witnessed "an argument going on" between Stewart, Carr, and another man and woman. *Id.* at 180. Lennen heard Stewart say, "[I]f you're still out here when I come back I got something for you." *Id.* at 181. Stewart then went inside. McCloud got into Gosler's vehicle and began to drive away when Gosler pushed the moped over, which "[h]it the back corner of the car." *Id.* McCloud jumped out of the car and hit Gosler "one time, [and] went to hit her again" at which time Stewart "was standing [outside the front door] with a rifle." *Id.* at 181-82. Stewart pointed the rifle at McCloud's chest and began shooting. Lennen believed Stewart shot McCloud nine or ten times. After McCloud fell to the ground, Stewart fired an additional round. *See id.* at 130-31, 216. Stewart "leaned over [McCloud] . . . and said I hope I killed your a**. Somebody call 911." *Id.* at 182. Lennen asked Stewart if "everything is ok" to which Stewart responded, "[H]e came in my house and hit my girl." *Id.* at 185. Stewart then went back into the house until police arrived.

[4] Police and paramedics arrived on scene. The paramedics immediately began to render aid to McCloud, who was "unconscious, not breathing, and . . . did not have a pulse." *Id.,* Vol. II at 169. Paramedics applied a monitor to assess McCloud's heart rhythm, which revealed his heart was no longer beating.

Paramedics pronounced McCloud dead at the scene. Stewart surrendered and was arrested by police.

[5] Later, Stewart was interviewed by police[2] and stated, "I didn't do anything wrong. I was just protecting my family." *Id.*, Vol. V at 184. He explained that he was sleeping in the back room when Carr woke him up and told him "this guy's in the house, and he's . . . beating the hell out of her friend[,]" Gosler. *Id.* at 189. He got up and witnessed McCloud beating the friend and then "he turn[ed] around and attack[ed]" Carr, who was holding their baby son. *Id.* at 189-90. He also stated that when they were all outside, McCloud attacked Gosler and Carr; he went inside, got his .22 rifle, and went back outside. He told McCloud to get off his property and described McCloud's attitude toward him as "I don't give a f***, like shoot me" to which Stewart responded, "you just broke in my house[,] scared the s*** out of my kids. . . . I got babies in here." *Id.* at 202. He claimed McCloud threatened to "spray this motherf*****" and "that's when he lunged at me and I fired off a shot[,]" which hit McCloud in the shoulder. *Id.* Stewart told police the shot "didn't really phase him. . . . And then he . . . kind of like lunged a little bit at me, and I shot him again . . . . [T]hen he went to like fall back, and then I . . . squeezed off probably like six (6) times[.]" *Id.* When police asked whether McCloud had a gun, Stewart acknowledged that he "didn't say [McCloud] had a gun." *Id.* at

---

[2] Detectives read Stewart his *Miranda* rights and he agreed to be interviewed.

211. When asked why he shot McCloud, Stewart responded, "I shot him after he was already attacking my baby momma and them. He had already seen the rifle [and] wasn't worried about it." *Id.* at 230. The State subsequently charged Stewart with murder.

[6] Detective Scott Sanderson of the Anderson Police Department ("APD") responded to the scene and noticed a camera on a nearby warehouse he knew belonged to Ken Kocinski, the owner of KT Pawn.[3] At the time, Detective Sanderson did not know whether the cameras were pointed toward the crime scene, so he contacted Kocinski, who contacted his out-of-state IT team for assistance. Kocinski reviewed the footage and discovered that one of the cameras recorded the shooting. The same day, APD Detective Norman Rayford went to the warehouse and watched the video which showed the shooting at 1717 Jefferson Street with Kocinski. Detective Rayford recorded the footage using his cellphone and subsequently uploaded the cellphone footage onto APD's "digital phone dump for evidence." *Id.,* Vol. III at 33. On May 17, APD Detective Larry Crenshaw met with Kocinski's wife at the warehouse to obtain the security camera footage. Detective Crenshaw watched her put the footage onto a thumb drive, which she then gave to him and he then

---

[3] Detective Sanderson was familiar with Kocinski from working in the burglary and theft unit.

uploaded onto APD's digital phone dump. Detective Crenshaw subsequently lost track of the thumb drive Kocinski's wife originally gave him.[4]

[7] In August 2019, Deputy Prosecutor Dan Kopp gave APD Detective Doug Stanton a thumb drive of unknown origin and asked him to slow down the video footage on the drive, which "was twice as fast as real time." *Id.* at 180. Deputy Prosecutor Andrew Hanna was also present when Kopp made this request. Using software, Detective Stanton successfully slowed the footage to half speed. A disc containing the original security camera footage was prepared for admission at trial as State's Exhibit 36 and a disc with the edited version was prepared for admission as State's Exhibit 37.

[8] Before trial, Stewart filed a motion to recuse Deputy Prosecutor Dan Kopp from the case alleging Kopp was a necessary witness in the chain of custody of the original and modified versions of the security footage (Exhibits 36 and 37). *See* Appellant's Appendix, Volume III at 136-37. Specifically, Stewart claimed:

> 3. The security footage came from the [APD] property room. Whether Mr. Kopp withdrew the evidence from the property room personally or received it from another individual, he is now a witness necessary to maintain the chain of custody of the security footage, as well as to establish the initial chain of custody of any modified version of the security footage prepared by Detective Stanton at his request.

---

[4] Later, another officer, Detective Stanton, reviewed the "phone dump" and could not locate this footage.

> 4. Allowing Deputy Prosecuting Attorney Kopp to combine the roles of advocate and witness would pose a substantial risk of confusing and misleading the jury, as well as enhancing the importance and credibility of . . . Kopp, (and by inference the State's entire case), at the expense of [Stewart]'s right to a fair and impartial trial.

*Id.* at 136-37 (citation omitted). The trial court denied the motion.

[9] A jury trial commenced on September 3, 2019. At trial, the State offered Exhibit 36 during Kocinski's testimony. Kocinski had testified that he has a security camera at his business at 19th and Jefferson Streets; he requested assistance from his IT team to access and view the footage; he reviewed the video at APD's request, which showed the shooting that occurred on May 9; and the exhibit is a true and accurate copy of the security footage from May 9 as it pertains to the shooting at 1717 Jefferson Street. *See* Tr., Vol. II at 235-36. The State moved to admit the exhibit and Stewart objected on the basis that the exhibit had not been properly authenticated pursuant to the silent witness theory. The trial court sustained the objection because there were "some holes as to what occurred between the recording . . . and it being viewed" but allowed the State to present additional foundational evidence. *Id.* at 242.

[10] Kocinski further testified that the cameras are motion activated, run continuously, and record onto a hard drive that can store about twenty-three hours of footage before "it loops" and begins to record over existing footage. *Id.* at 247. He also stated that the recording system was working properly on May 9, he is unable to alter the recordings, and the recording system records the

time and date but he was unaware as to whether it adjusted for daylight savings time. Kocinski testified that he watched the security camera footage with Detective Rayford on May 9, 2017; reviewed Exhibit 36 in August 2019; and agreed the exhibit is a true and accurate copy of the video he watched with Detective Rayford and is in the same or substantially the same condition as the copy he watched with Detective Rayford. The State again moved to admit Exhibit 36 and the trial court admitted it over Stewart's objection.

[11] During Detective Stanton's testimony, the State introduced Exhibit 37 and laid the foundation for it by eliciting testimony regarding Exhibit 36. Detective Stanton testified that Exhibit 36 was the original video footage he had been asked to review in the case. He reviewed the exhibit on August 15, 2019, initialed the disc indicating that he reviewed it, and agreed it was an accurate representation of the footage he originally saw. In addition, he viewed both the cellphone footage taken as Detective Rayford initially watched the security camera footage and Exhibit 36 and agreed the two were the same video "with the exception that [the] Detective was not holding his phone and recording it off the screen" on Exhibit 36. *Id.*, Vol. III at 226. He stated he had been asked to slow down the footage he was given, which he did using a computer program. When presented with Exhibit 37, Detective Stanton identified it as "my half speed video[,]" which he had reviewed earlier that day and initialed. *Id.* at 184. He stated that the video is a true and accurate representation of the original video, and aside from slowing down the video by using a program, he did not alter, add, or omit anything from the video. In fact, Detective Stanton

stated he could view the file's properties, which revealed the file had been created on May 9, 2017. *See id.* at 196, 228.

[12] The State then moved to admit Exhibit 37 as a demonstrative exhibit. Stewart objected based on lack of foundation for Exhibit 36 and therefore, for Exhibit 37. The trial court overruled the objection and admitted the exhibit, stating:

> At this point in the evidentiary record, I have two (2) witnesses that looked at the video footage on [May 9, 2017]. Both have looked at that video and looked at . . . Exhibit . . . 36 and say[ ] that they're the same[.] I have . . . Detective Stanton, also reviewing Exhibit [36] saying [it] is the same as Exhibit [37] other than it's half speed, that there are no other changes that he can note between Exhibit [36] and [37], which he's the one that created. . . . I have witnesses that are saying that the scene is depicted in Exhibit [36] are the same herein that's an issue in this case. I have the owner of the equipment indicating that it was operating without issue on [May 9, 2017], that he uses it at multiple locations at his businesses. And so, based on all of that, I am assured of Exhibit [36's] competence and authenticity, and by extension, I'm also assured of the authenticity and competence of Exhibit [37]. . . . [Exhibit 37] is only demonstrative, but I am granting it.

*Id.* at 205-06. During the trial, Stewart filed a Motion for Jury View to allow the jury to view the scene on Jefferson Street. The trial court granted the motion and the jury traveled to the scene.

[13] Ultimately, the jury found Stewart guilty as charged and the trial court sentenced him to fifty-seven years. Stewart now appeals. Additional facts will be supplied as necessary.

# Discussion and Decision

## I. Admission of Evidence

[14] Stewart argues that the trial court erred in admitting Exhibits 36 and 37 because the State failed to establish a sufficient foundation under the "silent witness" theory. We conclude the trial court did not abuse its discretion in admitting these exhibits.

### A. Standard of Review

[15] Our standard of review in this area is well-settled. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the trial court's decision for an abuse of that discretion. *Baker v. State,* 997 N.E.2d 67, 70 (Ind. Ct. App. 2013). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Morrison v. State*, 824 N.E.2d 734, 739 (Ind. Ct. App. 2005), *trans. denied*. We do not reweigh the evidence and consider only the evidence most favorable to the trial court's ruling. *Scott v. State*, 883 N.E.2d 147, 152 (Ind. Ct. App. 2008).

### B. Authentication and the "Silent Witness" Theory

[16] Indiana Evidence Rule 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Videos can be authenticated via witness testimony or, in instances

in which no witness observed what the video portrays, the silent-witness theory. *McFall v. State*, 71 N.E.3d 383, 388 (Ind. Ct. App. 2017).

[17] The "silent witness" theory permits the admission of photographs as substantive evidence, rather than merely as demonstrative evidence, so long as the photographic evidence is also relevant. *Wise v. State*, 26 N.E.3d 137, 141 (Ind. Ct. App. 2015), *trans. denied*. This theory has been extended to the use of video recordings. *Id.*

> [U]nder a silent witness theory, videotapes may be admitted as substantive evidence, but there must be a strong showing of authenticity and competency and . . . when automatic cameras are involved, there should be evidence as to how and when the camera was loaded, how frequently the camera was activated, when the photographs were taken, and the processing and changing of custody of the film after its removal from the camera.

*McHenry v. State*, 820 N.E.2d 124, 128 (Ind. 2005) (quotations and footnote omitted). This standard is applicable when "there is no one who can testify as to [the recording's] accuracy and authenticity because [it] must 'speak for itself' and because such a 'silent witness' cannot be cross-examined." *Wise*, 26 N.E.3d at 141 (quotation omitted).

> For this "silent witness" purpose, "the foundational requirements . . . are vastly different than the foundational requirements for demonstrative evidence." In such cases, "the witness is not required to testify that the photograph [or recording] is an accurate representation of the scene as it appeared" – and indeed, often could not "so testify since he or she was not necessarily there to observe the scene on that day." Instead, the witness

"must give identifying testimony of the scene that appears in the photographs" sufficient to persuade "the trial court . . . of their competency and authenticity to a *relative certainty*."

*Knapp v. State*, 9 N.E.3d 1274, 1282 (Ind. 2014) (citations and alterations omitted), *cert. denied*, 574 U.S. 1091 (2015). If a foundational requirement is missing, then the surrounding circumstances can be used. *McFall*, 71 N.E.3d at 388.

[18] Here, Exhibit 36 was admitted as substantive evidence. We conclude that the following foundational testimony supports the competency and authenticity of Exhibit 36 to a relative certainty:

- Kocinski testified that one of his warehouse security cameras, located on the corner of 19th and Jefferson Streets, recorded the shooting at 1717 Jefferson Street on May 9, 2017, which resulted in McCloud's murder; and his out-of-state IT team assisted him in accessing or viewing the footage.

- Kocinski stated that the cameras are motion activated, run continuously, and record onto a hard drive that stores up to twenty three hours of footage; the recording system was working properly on May 9; the system records the time and date, although he did not know whether the system adjusted for daylight savings time; and he had the ability to burn the footage onto a disc but did not have the ability to alter the footage.

- Kocinski watched the footage with Detective Rayford on May 9, 2017; he reviewed Exhibit 36 before trial and agreed it was a true and accurate copy of the video he watched with Detective Rayford.

In sum, Kocinski's testimony explains when the security camera captures footage, how much footage it records, the date and time of the recording, and how he obtained the footage at issue in the case. We conclude this is a strong showing of authenticity and competency.

[19] Stewart also claims the exhibits lacked foundation due to an inadequate chain of custody. However, under the "silent witness" theory, "the State is not required to exclude every reasonable possibility of tampering, but rather must only provide reasonable assurance that an exhibit has passed through various hands in an undisturbed condition." *Mays v. State*, 907 N.E.2d 128, 132 (Ind. Ct. App. 2009) (quotation omitted), *trans. denied*. Although we acknowledge, as does the State, there was inconsistent testimony as to whether the footage contained in Exhibit 36 was uploaded to APD's digital dump drive,[5] multiple witnesses at trial testified to Exhibit 36's authenticity – stating they viewed the exhibit prior to trial and it was a true and accurate copy of the footage they had previously watched. Kocinski and Detective Rayford watched the footage of the shooting on May 9, 2017; Detective Crenshaw watched the footage on May

_____

[5] As noted above, Detective Rayford took a video of the footage with his cellphone as he watched it with Kocinski on May 9, 2017, and Detective Crenshaw obtained a thumb drive with the footage from Kocinski's wife on May 17. Both detectives claimed to have uploaded the footage they received to APD's database; however, Detective Stanton testified that he could not locate the footage Detective Crenshaw uploaded.

17 and observed Kocinski's wife put the footage onto a thumb drive; and Detective Stanton watched the footage in August 2019 when he was asked by Deputy Prosecutor Kopp to slow down the footage. Each witness also watched Exhibit 36 prior to trial and testified the footage was the same or substantially the same as the footage they initially watched which depicted the May 9 shooting. *See* Tr., Vol. II at 250; *id.* Vol. III at 3, 29-30, 62-63, 177-78. And we note that Stewart does not allege that the footage contained in Exhibit 36 does not show what happened. This is sufficient to establish Exhibit 36's authenticity to a relative certainty and therefore, the trial court did not abuse its discretion in admitting this exhibit.

[20]     Exhibit 37 was admitted as demonstrative evidence and therefore, the "silent witness" theory is inapplicable. *See Wise*, 26 N.E.3d at 141. Demonstrative evidence is a "visual aid[ ] that assist[s] in the presentation and interpretation of testimony[.]" *Knapp*, 9 N.E.3d at 1282. And an adequate foundation for demonstrative evidence requires testimony that the video accurately depicts the scene or occurrence as it appeared at the time in question. *Id.* Exhibit 37 was introduced during Detective Stanton's testimony, who explained that the exhibit was a slowed down version of Exhibit 36 and it was an accurate representation of the original aside from slowing down the video via software. He stated he did not alter, add, or omit anything from the video; it was only slowed down to half-speed, which was more accurate than the original double speed video. During Gosler's testimony, the State moved to publish Exhibit 37 and the trial court granted the request. *See* Tr., Vol. IV at 135-37. As the video

played, Gosler testified that the scene depicted Stewart and Carr's house, her car, the individuals present, and described the events that occurred. *See id.* at 138-49. Gosler's testimony constitutes an adequate foundation for the admission of Exhibit 37.

[21] In sum, Exhibits 36 and 37 were properly authenticated. Therefore, the trial court did not abuse its discretion when it admitted these exhibits.

## C. Harmless Error

[22] Even if the video footage was admitted improperly, any error would have been harmless as it was cumulative of other evidence properly admitted. "The improper admission of evidence is harmless error when the erroneously admitted evidence is merely cumulative of other evidence before the trier of fact." *Hunter v. State*, 72 N.E.3d 928, 932 (Ind. Ct. App. 2017), *trans. denied*.

[23] In closing arguments, the defense argued Stewart acted in self-defense in shooting McCloud, stating that McCloud was "aggressive [and] posed a threat" and Stewart was protecting himself and his family. Tr., Vol. VI at 192, 194-95. However, Stewart admitted he shot McCloud multiple times, including after McCloud fell to the ground, a fact to which multiple witnesses also testified. He also acknowledged shooting McCloud because McCloud had been in his house and had allegedly attacked Carr. In light of this evidence, we conclude that Exhibits 36 and 37, the video footage of what transpired, was merely cumulative of other evidence properly admitted. Therefore, assuming *arguendo* that the exhibits were improperly admitted, any error was harmless.

# II. Motion to Recuse

Stewart also challenges the trial court's denial of his motion to recuse Deputy Prosecutor Kopp as prosecuting attorney on the case. Because Kopp delivered a thumb drive of unknown origin containing what became Exhibit 36 to Detective Stanton and requested a half speed version, Stewart contends Kopp "was an essential link in the chain of custody for State's Exhibits 36 and 37" and should have been "barred from acting as an advocate for the State." Brief of the Appellant at 16. We disagree.

Rule 3.7(a) of Indiana's Rules of Professional Conduct provides:

> A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would work substantial hardship on the client.

A witness is not necessary where the information a party seeks is available from other sources. *Willner v. State*, 612 N.E.2d 162, 165 (Ind. Ct. App. 1993), *trans. denied*. It is undisputed that Deputy Prosecutor Kopp did not testify at trial. The fact that Exhibit 36 was admitted under the "silent witness" theory obviates the need for Kopp's testimony as to that exhibit. *See McFall*, 71 N.E.3d at 388.

And therefore, we cannot conclude he was a necessary witness warranting recusal from the case based on his involvement with Exhibit 37, which shows the same thing but at a reduced speed. *See Thompson v. State*, 671 N.E.2d 1165, 1169 n.3 (Ind. 1996) (rejecting the defendant's argument that the prosecutor should have recused, pursuant to Rule 3.7 of Indiana's Rules of Professional Conduct, because the prosecutor was not a necessary witness and did not testify). Exhibit 37 was admitted as demonstrative evidence; therefore, all that the State was required to show to authenticate Exhibit 37 was that the footage accurately depicted the scene at the time in question. *Knapp*, 9 N.E.3d at 1282. The State did not need to prove chain of custody. And, as the State points out, Deputy Prosecutor Hanna was also present when Deputy Prosecutor Kopp approached Detective Stanton about creating Exhibit 37, meaning "at least one other witness was available who could provide the foundation for the exhibit other than Kopp." Brief of Appellee at 32. Therefore, we conclude the trial court did not err in denying Stewart's motion to recuse Deputy Prosecutor Kopp.[6]

# Conclusion

---

[6] The State analyzes Stewart's motion to recuse as a claim of prosecutorial misconduct. *See* Br. of Appellee at 28-34. Although Stewart does not claim that Kopp committed *prosecutorial misconduct* in handling the thumb drive, even if he did, his claim would fail. In reviewing a claim of prosecutorial misconduct, this court must determine whether the prosecutor engaged in misconduct, and if so, whether such misconduct, under all the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002). We cannot conclude Kopp's handling of the thumb drive constitutes misconduct and, even if it did, in light of the overwhelming evidence of Stewart's guilt, Stewart was not placed in grave peril. *See Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006).

[27] The trial court did not abuse its discretion in admitting Exhibits 36 and 37 or in denying Stewart's motion to recuse the lead deputy prosecutor. Therefore, we affirm.

[28] Affirmed.

Crone, J., and Brown, J., concur.