

FILED

Aug 17 2023, 8:54 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Fishers, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Megan M. Smith
Kyle M. Hunter
Deputy Attorneys General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kenneth R. Kirby, III,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | August 17, 2023<br><br>Court of Appeals Case No.<br>22A-CR-2917<br><br>Appeal from the Vanderburgh<br>Circuit Court<br><br>The Honorable David D. Kiely,<br>Judge<br><br>Trial Court Cause No.<br>82C01-2206-F4-3467 |

**Opinion by Judge Tavitas**
Judges Bailey and Kenworthy concur.

**Tavitas, Judge.**

## Case Summary

Kenneth Kirby, III, appeals his conviction for arson, a Level 4 felony. Kirby argues that: (1) the trial court abused its discretion by denying his motion to dismiss; (2) the trial court abused its discretion by admitting testimony regarding the substance of a surveillance camera video recording that was not offered into evidence; and (3) the State presented insufficient evidence to support Kirby's conviction. We find Kirby's arguments without merit and, accordingly, affirm.

## Issues

Kirby raises three issues on appeal, which we restate as:

> I. Whether the trial court abused its discretion by denying Kirby's motion to dismiss.
>
> II. Whether the trial court abused its discretion by admitting testimony regarding the substance of a surveillance camera video recording that was not offered into evidence.
>
> III. Whether the State presented sufficient evidence to support Kirby's conviction.

## Facts

Kirby has a younger sister, Lindsey Kirby, and a younger brother, Brandon Kirby. In 2022, Lindsey lived in a house in Evansville, and Brandon lived in a house nearby.

On June 19, 2022, at approximately 2:00 p.m., Lindsey contacted 911 and reported that Kirby was breaking into her house and threatening to burn it down. Lindsay stated, "[I] know that it is [Kirby], [] he's on the other line with me and now he's at my house." Tr. Vol. II p. 112. She further stated that "[w]e drove past[,] and I [saw] him out there"; that Kirby "had no shirt on and [was] wearing shorts"; and that Brandon was trying to stop Kirby from burning the house down. *Id.* at 112-13. Shortly thereafter, Lindsey contacted 911 again and reported that her neighbors informed her that her house was "smoking." *Id.* at 113.

The Evansville Fire Department quickly responded to the fire. District Chief Eric Eifert arrived at the scene and observed a "well-developed" fire in the house's backyard. *Id.* at 119. A small garage in the yard was consumed in flames and causing fire damage to the house, a neighboring business, and the power lines. Chief Eifert believed that the fire was "accelerated in some way . . . ." *Id.* at 120.

Meanwhile, Evansville Police Department Officer Allison Farmer was dispatched to the scene to investigate a report of disorderly conduct alleged against Kirby. Evansville Police Department Detectives Christopher Jones and Joseph Mayer arrived as well. Detective Mayer determined that the fire was "a result of human action," specifically "open flame to ignitable fluid" in the garage. *Id.* at 193. Detective Mayer further determined that the "ignition fuel was . . . gasoline." *Id.* at 190. Kirby was arrested at Brandon's house later that afternoon.

[7] After the fire was extinguished and power was restored, Lindsey invited the detectives inside the house to show them a video recorded by her backyard surveillance cameras ("the video"). The video depicted two white men in the backyard, one of whom was shirtless, wearing blue jean shorts and white shoes, and carrying a "red container in his hand." *Id.* at 181. The shirtless man entered the garage with the red container and then exited without the container. As he exited the garage, smoke and flames began to emanate therefrom.

[8] The detectives requested a copy of the video; however, Lindsey informed them that she had a previous engagement and needed to leave. The detectives arranged for Lindsey to call them later that evening. Lindsey neither called the detectives nor answered their subsequent phone calls. The detectives later obtained a search warrant to seize the DVR; however, the DVR was gone when they arrived, and it was never found.

[9] On the evening of the fire, Brandon's wife, Amber, consented to a search of her and Brandon's home. Law enforcement located a pair of blue jean shorts that matched those worn by the shirtless individual in the video. Additionally, next to the shorts, law enforcement located a pair of white shoes that had "an odor of gasoline coming from them." *Id.* at 161. Laboratory testing identified gasoline on the shoes.

On June 22, 2022, the State charged Kirby with Count I: arson, a Level 4 felony; and Count II: criminal mischief, a Class B misdemeanor; and alleged that Kirby was an habitual offender.[1]

The trial court held a jury trial on October 5, 2022. The State called Officer Farmer, and the following exchange took place:

> Prosecutor: Ma'am, what is RMS?
>
> Witness: RMS is a system that we use through our computers that stores people's data. If you've ever had any sort of citation, involvement in an incident, anything like that, whatever information that was implemented into that report is added to that system and any officer can pull it up by just your first and last name.
>
> Prosecutor: Are you sometimes able to find a photo of an individual?
>
> Witness. Yes. If somebody has been booked into Vanderburgh County Jail or has a CCW or anything [w]here they're imaged in, you can pull up their picture by running their name. . . .
>
> Prosecutor: Okay. What does CCW stand for?
>
> Witness: Conceal carry weapon license.
>
> Prosecutor: [W]ere you able to see a name for a Kenneth Kirby?

---

[1] On October 5, 2022, the State moved to dismiss Count II, which the trial court granted.

Witness:     Yes, sir.

Ex. Vol. IV pp. 9-10.

[12] Defense counsel moved for a mistrial on the grounds that the State implied that Kirby had a criminal record "by saying that [Officer Farmer] was able to look up [Kirby's] photograph through the RMS system." *Id*. at 10. The prosecutor responded:

> It's clear from [Officer Farmer's] testimony that you can be on RMS for issues that do not involve a criminal history. She said infractions, such as tickets or a concealed carry. Where we are going with this line of questioning, is that when she arrives to the scene, she sees an individual matching the photo that she saw, that she looked up for this disorderly conduct run. She looks in RMS, because this disorderly conduct run is alleged to involve Kenneth Kirby.

*Id*. at 11. The prosecutor added that any improper inference regarding Kirby's criminal history could be cured by: (1) asking Officer Farmer to clarify via testimony as to whether an individual might be included in the RMS "without any kind of criminal history," *id*. at 12; and (2) an instruction from the trial court to disregard any prejudicial inference regarding Kirby's criminal history.

[13] The trial court found that Officer Farmer's testimony implied that Kirby had a criminal history and granted the motion for mistrial. The trial court reset the jury trial for October 10, 2022.

[14]     On October 6, 2022, Kirby filed a motion to dismiss the arson charge. The motion alleged that the prosecutor's questions regarding the RMS were "intended to elicit responses which would goad the defendant's counsel into moving for a mistrial, with the intent to cause termination of the trial" and that, as a result, retrial was barred. Appellant's App. Vol. II p. 65. On October 7, 2022, Kirby filed a motion to suppress evidence regarding the shoes on which gasoline was identified.[2]

[15]     The trial court held hearings on the motion to dismiss and motion to suppress evidence on October 10, 2022, before the jury trial commenced. At the dismissal hearing, the prosecutor denied intending to cause a mistrial and explained that he was "human," "make[s] mistakes," and "could have asked a better question . . . ." Tr. Vol. II p. 77. The trial court found the prosecutor's explanation credible and denied the motion to dismiss.

[16]     At the suppression hearing, Amber testified that Kirby came to Brandon's house "often" and that it would not be "unexpected" to find Kirby's clothing in her house. *Id*. at 97. Detective Jones testified that Amber informed him that the shorts were Brandon's but that Kirby and Brandon "share[d] clothes from time to time" and that "the shoes were [Kirby's]." *Id*. at 85. The trial court denied the motion to suppress.

---

[2] Kirby argued that the shoes were illegally seized because "no valid consent was given for the arrest and/or search and seizure." Appellant's App. Vol. II p. 71. The motion to suppress was later denied, and Kirby does not appeal the denial of that motion.

[17] The trial court then commenced the second jury trial. Neither Lindsey, Brandon, Amber, nor Officer Farmer testified. The trial court admitted Lindsay's 911 calls over Kirby's hearsay objection. Additionally, because the State never located the DVR, the State did not offer the video into evidence. Instead, the State sought to introduce the testimony of Detectives Jones and Mayer regarding their observations from the video. Kirby objected to the detectives' testimony pursuant to the "silent witness theory" on the grounds that the detectives did not lay a proper foundation for the authenticity of the video. *Id*. at 153. The trial court overruled the objection and admitted the detectives' testimony.

[18] The jury found Kirby guilty of arson, a Level 4 felony. Kirby subsequently admitted to being an habitual offender. The trial court entered judgment of conviction and sentenced Kirby to ten years, enhanced by seven years for the habitual offender finding, for a total sentence of seventeen years in the Department of Correction. Kirby now appeals.

## Discussion and Decision

### I. The trial court did not abuse its discretion by denying Kirby's motion to dismiss

[19] Kirby first argues that, after the first trial resulted in a mistrial, the trial court abused its discretion by denying Kirby's motion to dismiss the arson charge. We are unpersuaded.

[20] The "double jeopardy" clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend 5. This clause restricts the government's ability to try a criminal defendant twice for the same offense. *Farris v. State*, 753 N.E.2d 641, 645-46 (Ind. 2001). Our Indiana Supreme Court has explained, however, that a defendant's motion for mistrial constitutes "'a deliberate election on his part to forgo'" his right to be free from a second trial. *Id*. at 645-46 (quoting *United States v. Scott*, 437 U.S. 82, 93, 98 S. Ct. 2187, 2195 (1978)).

[21] There is a narrow exception to this rule, and when it applies the defendant cannot be tried a second time regardless of the fact that the defendant requested a mistrial in the first trial. This exception applies only when the government's "'conduct in question'" was "'intended to goad the defendant into moving for a mistrial.'" *Id*. at 646 (quoting *Oregon v. Kennedy*, 456 U.S. 667, 676, 102 S. Ct. 2083, 2088 (1982)). The subjective intent of the prosecutor is the "dispositive issue." *Id*.

[22] This exception is codified in Indiana Code Section 35-41-4-3, which provides in relevant part:

> (a) A prosecution is barred if there was a former prosecution of the defendant based on the same facts and for commission of the same offense and if:
>
> * * * * *
>
> > (2) the former prosecution was terminated after the jury was impaneled and sworn or, in a trial by the court without a jury, after the first witness was sworn, unless (i)

the defendant consented to the termination or waived, by motion to dismiss or otherwise, his right to object to the termination, (ii) it was physically impossible to proceed with the trial in conformity with law, (iii) there was a legal defect in the proceedings that would make any judgment entered upon a verdict reversible as a matter of law, (iv) prejudicial conduct, in or outside the courtroom, made it impossible to proceed with the trial without injustice to either the defendant or the state, (v) the jury was unable to agree on a verdict, or (vi) false statements of a juror on voir dire prevented a fair trial.

**(b) If the prosecuting authority brought about any of the circumstances in subdivisions (a)(2)(i) through (a)(2)(vi) of this section, with intent to cause termination of the trial, another prosecution is barred.**

(Emphasis added).

[23] We review a trial court's denial of a motion to dismiss for an abuse of discretion. *Willoughby v. State*, 660 N.E.2d 570, 576 (Ind. 1996). Our Supreme Court has clarified, however, that a trial court's determination of prosecutorial intent, while not "conclusive," is "'very persuasive'" and is reviewed for clear error. *Farris*, 753 N.E.2d at 646 (quoting *Butler v. State*, 724 N.E.2d 600, 604 (Ind. 2000)).

[24] Here, in the first jury trial, the prosecutor asked Officer Farmer whether she saw Kirby in the RMS while responding to an allegation of disorderly conduct against Kirby, and Officer Farmer testified that she did. Kirby then moved for a mistrial and argued that Officer Farmer's testimony implied that Kirby had a

criminal record. The prosecutor explained that a person might be listed in the RMS for reasons unrelated to his or her criminal record and that the purpose of his question was not to cause a mistrial but to show that Officer Farmer identified Kirby at the scene of the fire. *Cf. Butler*, 724 N.E.2d at 604 n.5 (affirming denial of motion to dismiss when the State "offer[ed] a plausible explanation for its actions"); *Noble v. State*, 734 N.E.2d 1119, 1123 (Ind. Ct. App. 2000) (affirming denial of motion to dismiss when State's trial strategy was "misguided" but did not "provide evidence that the State intended to force [the defendant] to move for a mistrial"), *trans. denied*.

[25] Additionally, the prosecutor admitted that he could have better phrased his question and asked the court for a curative instruction in lieu of a mistrial. The trial court ordered a mistrial and set the second trial for five days later.

[26] Kirby argues that the prosecutor was "a highly experienced prosecutor who has tried multiple cases [and] would understand the danger of asking an open-ended question about whether a defendant was listed in a system which records an individual's interactions with law enforcement." Appellant's Br. p. 17. In denying the motion to dismiss, however, the trial court implicitly found that the prosecutor did not intend to cause a mistrial, and we see no reason to disagree. We cannot say that the trial court's finding regarding the prosecutor's intent was clearly erroneous. Accordingly, we conclude that the trial court did not abuse its discretion by denying Kirby's motion to dismiss.

## II. The trial court did not abuse its discretion by admitting testimony regarding the substance of the video

[27] Kirby next argues that, pursuant to the silent witness theory, the trial court abused its discretion by admitting the testimony of Detectives Jones and Mayer regarding their observations from the video. We first find that the silent witness theory applies here even though the video was not offered into evidence. We further find that the State laid a sufficient foundation for the detectives' testimony and that, as a result, the trial court did not abuse its discretion by admitting that testimony.

### A. Evidence Rule 901(b)(9)—The Silent Witness Theory

[28] The foundation required for the admission of a photograph or video offered as "substantive evidence" differs from the foundation required for the admission of a photograph or video offered as "demonstrative evidence." *Knapp v. State*, 9 N.E.3d 1274, 1282 (Ind. 2014) (quoting *Smith v. State*, 491 N.E.2d 193, 196 (Ind. 1986)). Evidence offered for substantive purposes acts as a "silent witness[] as to what activity is being depicted" whereas evidence offered for demonstrative purposes is merely an "'aid[] that assist[s]" in a human witness's testimony.'" *Id*. (quoting *Smith*, 491 N.E.2d at 195-96). The silent witness theory is often invoked when a proponent seeks to introduce photographic or video evidence for the purpose of depicting certain events and no human witness testifies regarding their first-hand observations of those same events. *See, e.g.*, *McCallister v. State*, 91 N.E.3d 554, 561 (Ind. 2018) (surveillance video);

*McFall v. State*, 71 N.E.3d 383, 388 (Ind. 2017) (cell phone video recordings and photographs where cell phone owner did not testify).

[29] The silent witness theory is an application of Evidence Rule 901. *See McFall*, 71 N.E.3d at 388. Evidence Rule 901(a) provides that, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pursuant to Evidence Rule 901(b)(9), "[i]n order to authenticate videos or photographs using the silent-witness theory, there must be evidence describing the process or system that produced the videos or photographs and showing that the process or system produced an accurate result." *McFall*, 71 N.E.3d at 388 (citing Ind. Evid. R. 901(b)(9)).[3]

[30] The silent witness theory requires a proponent of substantive evidence to lay a stronger foundation regarding the evidence's authenticity than if the proponent were offering the evidence merely for demonstrative purposes. *See Knapp*, 9 N.E.3d at 1282 (explaining that, when a photograph is offered for demonstrative purposes, testimony that the photograph "'accurately depict[s] the scene or occurrence as it appeared at the time in question'" is an "adequate foundation" but that when the photograph is offered for substantive purposes, such testimony will often be inadequate on its own because the testifying

---

[3] Evidence Rule 901(b)(9) provides, "*Evidence About a Process or System*. Evidence describing a process or system and showing that it produces an accurate result."

witness "'was not necessarily there to observe the scene on that day'" (quoting *Smith*, 491 N.E.2d at 195-96)).

[31] The burden is "'rather strict.'" *McFall*, 71 N.E.3d at 388 (quoting 13 Robert L. Miller, Jr., INDIANA PRACTICE, INDIANA EVIDENCE § 901.209 (4th ed. 2016)). Our courts have explained:

> [T]he proponent must show that the photograph or video was not altered in any significant respect, and the date the photograph or video was taken must be established when relevant. [13 Miller at § 901.209]; *see also Wise v. State*, 26 N.E.3d 137, 141 (Ind. Ct. App. 2015) (noting that when automatic cameras are involved, "there should be evidence as to how and when the camera was loaded, how frequently the camera was activated, when the photographs were taken, and the processing and changing of custody of the film after its removal from the camera[]" (quotation omitted)), *trans. denied*. If a foundational requirement is missing, then the surrounding circumstances can be used.

*Id*.

[32] Though our courts have declined to "'lay down extensive, absolute foundation requirements,'" *Kindred v. State*, 524 N.E.2d 279, 298 (Ind. 1988) (quoting *Bergner v. State*, 397 N.E.2d 1012, 1017 (Ind. Ct. App. 1979)), ultimately, the proponent must convince the trial court of the silent witness evidence's "competency and authenticity to relative certainty," *McCallister*, 91 N.E.3d at 562; *cf. McFall*, 71 N.E.3d at 388 (silent witness theory "requires only that the process or system be described in such a way as to allow the trier of fact to find that it is more likely than not that the system produced an accurate result").

We review the admission of silent witness evidence for an abuse of the trial court's discretion. *Id.* at 561.

[33] The State argues that the silent witness theory is inapplicable here because the video was not offered into evidence.[4] Kirby, meanwhile, urges us to apply the silent witness theory's heightened foundation requirements regardless of that fact. He argues that, "without the heightened foundational requirements, there are no assurances that the video was accurate, not altered, or even that it recorded the crime in question." Appellant's Br. p. 20.

[34] Here, the detectives testified regarding their observations from a video that was a silent witness to the arson. We find no practical difference between admitting the video itself and admitting the video's substance indirectly through this testimony. Accordingly, we are persuaded that the silent witness theory's

---

[4] The State also argues that the detectives' testimony was admissible under the best evidence rule. Evidence Rule 1002 provides, in relevant part, "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a statute provides otherwise." Pursuant to Evidence Rule 1004:

> An original is not required and other evidence of the content of a writing, recording, or photograph is admissible if:
>
> > (a) all originals are lost or destroyed, and not by the proponent acting in bad faith;
> >
> > (b) an original cannot be obtained by any available judicial process;
> >
> > (c) the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing; or
> >
> > (d) the writing, recording, or photograph is not closely related to a controlling issue.

The State argues that, because the video was lost through no fault of the State, the detectives were permitted to testify regarding their observations from the video notwithstanding the fact that the video was not offered into evidence. Even if we assume, without deciding, that the State is correct, the fact that the detectives' testimony might be admissible under the best evidence rule does not necessarily mean that testimony could not be rendered inadmissible based on other evidentiary rules, here, Evidence Rule 901(b)(9).

foundation requirements are applicable when, as here: (1) witnesses testified regarding the substance of a video; (2) the video recorded events that the witnesses themselves did not observe first-hand; and (3) the video was not offered into evidence. Several opinions of this Court and one case outside our jurisdiction inform our decision.

[35] The State relies on *Pritchard v. State*, 810 N.E.2d 758 (Ind. Ct. App. 2004), to argue that a silent witness foundation was not required. In that case, the defendant was charged with battery of his cellmate. *Id.* at 760. At trial, witnesses testified regarding their observations from a jail surveillance recording, although the recording itself had been "purged" and was not offered into evidence. *Id.* The defendant challenged the witnesses' testimony under the silent witness theory. *Id.* at 761 n.3. On appeal, a panel of this Court held in a short footnote that the silent witness theory was inapplicable because the recording itself was not admitted into evidence. *Id.* The panel further held that the witnesses could testify regarding their observations from the recording because those observations were "within their personal knowledge." *Id.* (citing Evid. R. 602).

[36] Since *Pritchard*, several decisions from this Court have suggested that *Pritchard*'s holding—that the silent witness theory is inapplicable when the silent witness evidence itself is not admitted—is incorrect. In *Wise v. State*, the defendant, Wise, was charged with rape and several counts of criminal deviate conduct for having sexual intercourse with his then-wife, M.B., after "sneak[ing] Xanax" into her beverages. 26 N.E.3d 137, 139-140 (Ind. Ct. App. 2015), *trans. denied*.

Wise recorded several of these instances on his cell phone, which M.B. discovered. *Id*. at 139. "Not knowing how to retain videos directly from the phone, M.B. played the videos on Wise's phone and recorded the playback with a second handheld camcorder." *Id*. at 139-140.

[37] At trial, the State offered the second-hand recordings into evidence but not the original recordings from Wise's cell phone, which had been lost. *Id*. at 142. The trial court admitted the second-hand recordings over Wise's silent-witness-theory objection. *Id*. at 140, 142. On appeal, the panel recognized that the silent witness theory was "not an especially neat fit," but nonetheless found that the theory "provide[d] an adequate framework" for the case. *Id*. at 142. The panel held that the State laid a sufficient foundation for the admission of the second-hand recordings based on the surrounding circumstances. *Id*. at 142-43.

[38] More recently, in *Stott v. State*, 174 N.E.3d 236, 240 (Ind. Ct. App. 2021), the defendant, Stott, was charged with several offenses stemming from a car chase that resulted in Stott crashing a vehicle and fleeing from police. At trial, "the only direct evidence" identifying Stott as the driver was photographs taken by law enforcement of a recording captured by a McDonald's building security cameras on the day of the car crash. *Id*. at 244. The photographs showed Stott wearing the same "all denim" clothing that the previously-unidentified driver had worn earlier that day. *Id*. at 239-240. The State did not offer into evidence the McDonald's recording itself, but rather offered the still photographs in lieu thereof. The trial court admitted the photographs of the surveillance footage over Stott's silent-witness-theory objection. *Id*. at 244.

[39]     On appeal, the State argued that the silent witness theory was inapplicable because the surveillance footage was not offered into evidence. *Id*. at 245. Nonetheless, a panel of this Court held that the silent witness theory applied, stating:

> Though we acknowledge the logic in the State's argument, accepting its position would require us to ignore the reality of what [the police officer]'s photographs intend to portray: people inside a McDonald's restaurant at a specific time on a specific day. And the State used those photographs as substantive evidence to identify Stott as the man wearing an all-denim outfit on the day of the incident. What matters for foundational purposes is that no testifying witness was inside the McDonald's to observe the scene the photographs depict. The same is true of the actual surveillance footage; it captured a scene that no testifying witness was there to observe. Therefore, in this context, we see no practical difference between photographs of the footage and still-images extracted from the footage—both depict a scene that was not observed by any testifying witnesses. We refuse to elevate form over substance and in turn conclude that the silent-witness theory provides an adequate framework for evaluating the photographs' admissibility.

*Id*. In so holding, the panel found *Wise* persuasive and disagreed with *Pritchard*. *See id*. at 245 n.8, 245-46.

[40]     We also find persuasive *Commonwealth v. Connolly*, 78 N.E.3d 116 (Mass. App. Ct. 2017), *cited with approval in Commonwealth v. Davis*, 168 N.E.3d 294, 311 (Mass. 2021), a case that confronted facts similar to *Pritchard* but reached a different result. In that case, the defendant, Connolly, was charged with assault and battery for shoving a woman in an apartment building. *Id*. at 118-119. At

trial, a police officer testified regarding what he saw on footage recorded by the apartment building's security cameras; however, the recording had been lost through no fault of the Commonwealth. *Id.* On appeal, though the Court did not mention the silent witness theory by name, the Court "reject[ed] the premise that the unavailability of the video relieved the Commonwealth of any obligation to establish, as a condition of admissibility, that what [the testifying officer] watched was a fair and accurate depiction of the events in question." *Id.* at 122. The Court observed,

> Of course, had the video been available at trial, the Commonwealth would have had to authenticate it before it could be admitted. . . . But because the video was lost, the Commonwealth offered [the officer]'s testimony as secondary evidence of its contents. It logically follows that, in order for this secondary evidence to be admissible, the Commonwealth had to lay enough foundation to allow a reasonable jury to conclude that the primary evidence, the video the officer watched, was in fact what he represented it to be.

*Id.* at 122-23 (internal citations and quotations omitted).

[41]     Here, although the video was not offered into evidence, like the secondary evidence in *Stott* and *Connolly*, the detectives' testimony relied on a silent witness to events that no testifying witness observed first-hand. The silent witness theory's heightened foundation requirements would have certainly been triggered had the video itself been admitted into evidence, and we see no reason why the fact that the video was not admitted relieves the State of the burden of proving the video's reliability under the silent witness theory.

[42] Indeed, the silent witness theory's foundation requirements are even more appropriate in this case where, in contrast to *Wise* and *Stott*, the secondary evidence offered by the State is not merely a partial duplicate of the original silent witness evidence, but rather pure testimony of the detectives' observations from the video. In *Bergner*, 397 N.E.2d 1017, when this Court first adopted the silent witness theory as a matter of Indiana law, we cautioned that silent witness evidence presents "the potential for distortive and misrepresentative images. . . ." In a case such as this, where the silent witness evidence is never itself admitted, those same concerns are still present and to a greater extent. The video is never available for the fact-finder to see and evaluate.

[43] Moreover, it will be a tall order for even the most seasoned trial attorney to effectively cross examine a testifying witness's account of evidence that is not admitted into evidence. That task is even more onerous where, as here, neither Defense counsel nor any witness other than the detectives ever saw the video. Thus, laying a strong foundation for the video's reliability is all the more necessary.

[44] Based on the foregoing, we conclude that the silent witness theory's heightened foundation requirements apply in the instant case, and we disagree with *Pritchard*'s holding to the contrary. We turn now to whether the State laid a sufficient foundation for the detectives' testimony and conclude that the State has met that burden.

## B. The State laid a sufficient foundation for the detectives' testimony

[45] As we have explained, the silent witness theory requires the proponent to lay a foundation for the evidence's reliability pursuant to Evidence Rule 901(b)(9). Our chief concerns are the accuracy of the evidence and whether that evidence has been "altered in any significant respect." *McFall*, 71 N.E.3d at 388. Our courts have declined to "lay down extensive, absolute foundation requirements" for silent witness evidence, *Kindred*, 524 N.E.2d 298, and we may look to the "surrounding circumstances" to assure ourselves that a proper foundation has been laid, *McFall*, 71 N.E.3d at 388.

[46] Here, Detective Jones testified outside the presence of the jury[5] to the following: three cameras were attached to the back of the house and faced the backyard. On the same day as the fire, after power was restored to the house, Lindsay invited Detectives Jones and Mayer into the house to show them the video. The video was stored on a DVR hard drive, which the detectives observed in Lindsay's bedroom. In the detectives' presence, Lindsay "pulled up" the video on a monitor connected to the DVR, Tr. Vol. II p. 142, and Detective Jones subsequently took over "operating" the DVR, *id*. at. 144. The video depicted two men, including a shirtless man wearing blue jean shorts and white shoes who appeared to the set the garage aflame.

---

[5] Detective Jones later testified to many of the same facts in the presence of the jury.

[47] We are persuaded that the State laid a sufficient foundation for the detectives to testify regarding their observations from the video. Detective Jones testified regarding the placement of the cameras as well as how and where the video was stored. Little time elapsed between the recording of the arson and the detectives' viewing of the video, and the power was cut off during that intervening period. It is, thus, unlikely that the video was, or could have been, altered during this time period. *Cf. Connolly*, 78 N.E.3d at 124 (holding the Commonwealth failed to lay a sufficient foundation for police officer's testimony regarding security camera footage that was not offered into evidence when the officer did not testify regarding the date and time of the video or the place shown in it, the surveillance procedures of the apartment building, the "placement of the cameras and the nature of the equipment," the circumstances under which the officer was shown the video over one month after the incident, or how the video was stored during the time between its recording and the officer's viewing of it).

[48] Additionally, the video's depiction of the arson was corroborated by other evidence: Lindsay's 911 call placed Kirby and Brandon at the house, and Lindsay described Kirby as shirtless and wearing shorts. On the same day as the fire, law enforcement recovered jean shorts and white shoes on which gasoline was identified from Brandon's house. Finally, at the suppression hearing, Amber testified that Kirby often came over to Brandon's house and that it would not be unusual to find Kirby's clothing there, and Detective Jones

testified that Brandon and Kirby shared clothing and that the white shoes belonged to Kirby.

[49] Kirby points out that Detective Jones admitted that he did not know "the way the DVR operates," Tr. Vol. II p. 148, and that Detective Mayer testified that the timestamp on the video was "not accurate," *id*. at 180. We cannot say, however, that these deficiencies are fatal. Today, home security cameras are widely accessible to the public and are not technically complicated to the average user. A lack of understanding regarding the inner mechanics of a home security DVR system does not necessarily render the footage stored therein unreliable. That is especially the case where, as here, Detective Jones understood that the video was stored on the DVR, and, indeed, observed the video being pulled up from the DVR hard drive. Further, as to the inaccuracy of the time stamp, it is not unheard of for a security camera's internal clock to be inaccurate. Given that the video depicted the ignition of the very same garage that was burned to the ground on the day in question, we also do not think that the inaccuracy of the time stamp renders the video unreliable. *Cf. Young v. State*, 198 N.E.3d 1172, 1181 (Ind. 2022) (inaccuracy of surveillance video's time stamp did not render the evidence against the defendant insufficient when "the rest of the web of facts" supported the jury's verdict).

[50] We find that the State laid a sufficient foundation for the detectives' testimony regarding their observations from the video. Accordingly, we cannot say that the trial court abused its discretion by admitting the detectives' testimony.

### III. Sufficient evidence supports Kirby's conviction

Lastly, Kirby challenges the sufficiency of the evidence to support his conviction for arson. We find the evidence sufficient.

Sufficiency of evidence claims "warrant a deferential standard, in which we neither reweigh the evidence nor judge witness credibility." *Powell v. State*, 151 N.E.3d 256, 262 (Ind. 2020) (citing *Perry v. State*, 638 N.E.2d 1236, 1242 (Ind. 1994)). "When there are conflicts in the evidence, the jury must resolve them." *Young*, 198 N.E.3d at 1176. We consider only the evidence supporting the judgment and any reasonable inferences drawn from that evidence. *Powell*, 151 N.E.3d at 262 (citing *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018), *cert. denied*). "We will affirm a conviction if there is substantial evidence of probative value that would lead a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt." *Id.* at 263. We affirm the conviction "unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Sutton v. State*, 167 N.E.3d 800, 801 (Ind. Ct. App. 2021) (quoting *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007)).

Here, Kirby was charged with and convicted of arson, a Level 4 felony, pursuant to Indiana Code Section 35-43-1-1(a), which provides in relevant part:

A person who, by means of fire, explosive, or destructive device, knowingly or intentionally damages:

\* \* \* \* \*

(3) property of another person without the other person's consent if the pecuniary loss is at least five thousand dollars ($5,000);

\* \* \* \* \*

commits arson, a Level 4 felony.

[54] Kirby challenges only his identity as the arsonist. He argues that the only evidence identifying Kirby as the arsonist was Lindsey's hearsay statements during the 911 call, which, he claims, are unreliable and do not constitute present sense impressions excepted from the rule against hearsay. *See* Evid. R. 803(1) (defining a present sense impression as "[a] statement describing or explaining an event, condition or transaction, made while or immediately after the declarant perceived it"). Kirby further argues that, pursuant to our holding in *Jackson v. State*, "[h]earsay evidence, standing alone and not clothed with indicia of reliability associated with the exceptions which may render it admissible, is not sufficient evidence of probative value to sustain a conviction." 485 N.E.2d 144, 147 (Ind. Ct. App. 1985), *trans. denied*.

[55] First, Kirby does not argue that the trial court erred by admitting into evidence hearsay statements made during the 911 call, and any challenge to that evidence, therefore, is waived. Waiver notwithstanding, we are persuaded that Lindsey's statement during the 911 call that she drove by and saw that Kirby

was shirtless, wearing shorts, and at her house constitutes a present sense impression. Ind. Evid. R. 803(1); *see Jones v. State*, 780 N.E.2d 373, 377 (Ind. 2002) (holding that victim's statement that the man driving by was her landlord constituted a present sense impression).

[56] As for Lindsay's statement that Kirby was threatening to burn her house down, Kirby was "on the other line" with Lindsay when Lindsay called 911, and Lindsay reported that Kirby was "stating he's breaking in or he's going to burn my house down." Tr. Vol. II p. 112. We have hearsay within hearsay here. "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Ind. Evid. R. 805. The statement is not excluded as inadmissible hearsay if, at each level, a hearsay exception allows for the admission. Lindsay's statement to the 911 operator was an excited utterance. Ind. Evid. R. 803(2). Moreover, Kirby's statement to Lindsay, which Lindsay repeated to the 911 operator, is a statement offered by the State against the defendant and not considered hearsay pursuant to Evidence Rule 801(d)(2). *See* Ind. Evid. R. 801(d)(2) (defining statements made by an opposing party and offered against that party as not hearsay); *Banks v. State*, 761 N.E.2d 403, 406 (Ind. 2002) ("A party's own statement offered against that party is not hearsay.").

[57] Additionally, we find *Jackson*'s holding inapplicable here. In *Jackson*, we observed that hearsay statements were "the only evidence" supporting Jackson's conviction. 485 N.E.2d at 146. Here, however, Lindsey's statements were corroborated by other evidence. In the 911 call, Lindsey reported that

Kirby threatened to burn her house down and that Brandon was trying to stop Kirby. She further reported that she drove past her house and saw Kirby at her house shirtless and wearing shorts. Detectives Jones and Mayer testified that Lindsey's cameras recorded two white men in her backyard, one of whom was shirtless, wearing shorts and white shoes, and who appeared to set the garage aflame. Kirby was arrested later that day at Brandon's house, where law enforcement recovered a pair of shorts and shoes matching those worn by the shirtless man in the video, and laboratory testing identified gasoline on the shoes. The evidence against Kirby, therefore, did not consist solely of hearsay evidence, and the jury could have reasonably inferred that the shirtless man who set fire to the garage was Kirby. Accordingly, the State presented sufficient evidence to support Kirby's conviction.

## Conclusion

[58] The trial court did not abuse its discretion by denying Kirby's motion to dismiss, nor did it abuse its discretion by admitting the detectives' testimony regarding their observations from the video. Additionally, the State presented sufficient evidence to support Kirby's conviction. Accordingly, we affirm.

[59] Affirmed.

Bailey, J., and Kenworthy, J., concur.